WILLIAM ROYCE *vs.* COMMISSIONER OF CORRECTION
& another.[1]

Norfolk. March 10, 1983. — November 10, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, & O'CONNOR, JJ.

*Imprisonment. Administrative Law,* Regulations.

It was error for a judge, acting on his own initiative, to dismiss a com-
plaint by a State prison inmate who alleged that he had been confined
in administrative segregation for over two years and had received no
review of his case or any classification hearing during that time, since
the alleged facts, if proved, would show violations of Department of
Correction regulations entitling the inmate to relief. [427-430]

CIVIL ACTION commenced in the Superior Court Depart-
ment on July 27, 1982.

Judgment of dismissal was ordered by *Roger J. Donahue,* J.

After review was sought in the Appeals Court, the
Supreme Judicial Court ordered direct appellate review on
its own initiative.

The case was submitted on briefs.

*William Royce,* pro se.

*Francis X. Bellotti,* Attorney General, *Stephen R. Delin-
sky, Barbara A. H. Smith & Leo J. Cushing,* Assistant At-
torneys General, for the defendant.

*John M. Thompson & Candace L'Ecuyer,* for Prisoner's
Legal Assistance Clinic, amicus curiae.

LIACOS, J. This is an appeal by the plaintiff from the
dismissal of his pro se complaint for declaratory relief, by a
judge of the Superior Court in Norfolk County, "as contain-

---

[1] Plaintiff's complaint also included the superintendent of the
Massachusetts Correctional Institution at Walpole as a defendant.

ing no merit."[2] Mass. R. Civ. P. 12(b) (6), 365 Mass. 754 (1974). We transferred the plaintiff's appeal here on our own motion.

The plaintiff's complaint sets forth a variety of claims that his transfer to the Departmental Segregation Unit (D.S.U.) at the Massachusetts Correctional Institution at Walpole (M.C.I., Walpole) was illegal in that the transfer was in violation of State regulations as well as State statutes, and of his constitutional rights under both the Federal and State Constitutions.[3]

We conclude that the plaintiff's claim of regulatory violation by the duration of his confinement not only stated a valid claim, but also is dispositive of the case. We do not address, therefore, the plaintiff's statutory or constitutional claims.

The facts alleged in the complaint are to be taken as true in light of the dismissal of the complaint under Mass. R. Civ. P. 12(b) (6). The plaintiff is an inmate lawfully committed to the custody, power, and control of the Department of Correction. On May 29, 1981, the plaintiff was removed from the general prison population at M.C.I., Concord, and was placed in the D.S.U. at M.C.I., Walpole. He had no classification hearing prior to placement in the D.S.U. The plaintiff requested a hearing before the D.S.U. classification board and was given a hearing date of

---

[2] The defendants argue that the trial judge properly dismissed the complaint because it was not accompanied by a filing fee pursuant to Mass. R. Civ. P. 3, as amended, 385 Mass. 1213 (1982), or by an affidavit of indigency pursuant to G. L. c. 261, § 27B, and § 27C. The plaintiff contends that he did file an affidavit of indigency with the complaint. The record contains no information to support either position. The judgment indicates that the complaint was "entered without a fee." We conclude that, the complaint having been entered in the Superior Court and then dismissed, the appeal is properly before us.

[3] The plaintiff properly stated a claim for declaratory relief. See G. L. c. 231A, § 2; Mass. R. Civ. P. 57, 365 Mass. 826 (1974). See *Nelson* v. *Commissioner of Correction, ante* 379 (1983). We assume that the trial judge did not dismiss the complaint for failure to state a proper claim for declaratory relief but rather that the dismissal went to the substantive claims.

January 28, 1982.  At the time the plaintiff filed his pro se complaint on July 27, 1982, he still had not been accorded a classification hearing.  It appears that the plaintiff may still be confined in the D.S.U.[4]  Throughout this time the plaintiff alleges that he has not received any review of his status.

Our analysis begins with the recognition that courts permit prison administrators considerable discretion in the adoption and implementation of prison policies.  See *Bell* v. *Wolfish*, 441 U.S. 520, 547 (1979); *Nelson* v. *Commissioner of Correction, ante* 379 (1983).  However, the limits of such discretion are established by the rules and regulations promulgated by the Department of Correction.  Once an agency has seen fit to promulgate regulations, it must comply with those regulations.  "[A]gency regulations have the 'force of law.'" *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 768-769 (1980), quoting *DaLomba's Case*, 352 Mass. 598, 603 (1967).

Pursuant to G. L. c. 124, §§ 1(*b*) and 1(*q*), and G. L. c. 127, § 39, the Department of Correction has promulgated rules and regulations governing the transfer of inmates to the D.S.U.  See 103 Code Mass. Regs. § 421.01 et seq. (1978).  See also G. L. c. 30A, § 1A.  Because of its importance to the instant case, we reprint the pertinent section in the margin.[5]  These regulations state that an inmate

---

[4] There is no indication on the record that the plaintiff has been reclassified or removed from the D.S.U.  Thus, it appears that the plaintiff may have been held in detention for over two years without review.

[5] The applicable section of the regulation governing transfers to D.S.U. states:
"421.07: *Transfers to a Departmental Segregation Unit*
"(1) A resident may be transferred to a departmental segregation unit after a finding by the commissioner that the record of the resident or other reliable information indicates that:
"(a) The resident poses a substantial threat to the safety of others;
"or
"(b) The resident poses a substantial threat of damaging or destroying property; or
"(c) The resident poses a substantial threat of interrupting the operation of the state correctional facility if he is confined in the general population of any state correctional facility.

may be transferred to the D.S.U. (1) to effectuate administrative segregation if the inmate fits into one of three substantive categories,[6] 103 Code Mass. Regs. § 421.07 (1) (1978), or (2) to enforce a disciplinary sanction, only if the inmate fits into one of the substantive categories, 103 Code Mass. Regs. § 421.07(2) (1978). See *Parenti* v. *Ponte,* 565 F. Supp. 987, 988 n.3 (1983). Moreover, in all cases where a transfer to the D.S.U. is considered, the inmate must be given a reclassification hearing. See 103 Code Mass. Regs. § 421.07(3) (1978).

The uses of unmistakably mandatory language requiring that "specific substantive predicates" be found and requiring that intricate classification procedures shall be followed before any inmate is transferred to the D.S.U. would appear to create binding regulations.[7] See *Hewitt* v. *Helms,*

---

"(2) Notwithstanding any rule or regulation of the department to the contrary, a resident shall not be transferred to a departmental segregation unit for committing a specific punishable offense unless a disciplinary board has found him guilty of such specific offense and imposed a sanction pursuant to 103 CMR 430.00 (*Disciplinary Process Rules and Regulations*), and the commissioner has made a finding in accordance with 103 CMR 421.07(1). This shall be the case regardless of whether the specific punishable offense has been referred to outside law enforcement agencies for investigation and possible prosecution of the resident.

"(3) Upon receipt of a request from a superintendent to the commissioner to transfer a resident to a departmental segregation unit, the rules set forth in 102 CMR 420.13(2) (*Guidelines for the Operation of the Reclassification Process — Intra-Facility and Interfacility*), shall be followed in determining whether to authorize the transfer of the resident to such unit; except that 103 CMR 420.13(2)(o) shall not be applicable."

[6] The finding by the Commissioner, before he may impose administrative segregation in the D.S.U., that the resident poses a substantial threat to others, to property, or to the security of the institution if he remains in the general prison population is almost identical to one of the criteria permitting placement in "awaiting action" status. Compare 103 Code Mass. Regs. § 421.07(1)(a)-(c), and § 430.19(1)(d) (1978). See also G. L. c. 127, § 39.

[7] We need not decide today whether the use of mandatory language gives rise to a State-created and constitutionally protected liberty interest in administrative segregation and transfers. See, e.g., *Olim* v. *Wakinekona,* 461 U.S. 238, 248-251 (1983); *Hewitt* v. *Helms,* 459 U.S. 460, 472 (1983); *Bills* v. *Henderson,* 631 F.2d 1287, 1291 (6th Cir. 1980);

459 U.S. 460, 472 (1983). Nevertheless, we do not address whether the plaintiff has been transferred to the D.S.U. in violation of the regulations because two separate but overlapping regulations provide an exception to the regulatory requirements. The classification regulations provide an exception to the requirement of reclassification prior to a transfer to the D.S.U. if an inmate is in "awaiting action" status. See 103 Code Mass. Regs. § 420.13(2)(b) (1978). The disciplinary regulations provide that an inmate may be put in any area designated if the inmate is placed in awaiting action status.[8] See 103 Code Mass. Regs. § 421.06(1) and § 430.19(1) (1978). As the plaintiff has not been reclassified but has been put in the D.S.U., we conclude that his placement in the D.S.U. must be the result of his being placed in administrative segregation to effectuate awaiting action status.

By definition, however, awaiting action status is a temporary status pending one of four events: (1) an investigation, (2) a disciplinary hearing, (3) a change in custody status, or (4) isolation when the inmate's presence imposes a serious threat. See 103 Code Mass. Regs. § 430.19(1) (1978). A condition which exists only until the occurrence of a specific circumstance must terminate at some identifiable point in time. Prison administrators may not abuse their discretion in this regard, by using awaiting action status as a means to accomplish an unlimited punishment immune to the procedures set forth in the rules and regulations. See Hewitt v. Helms, supra at 479 (Stevens, J., dissenting, with whom Brennan and Marshall, JJ., join). They

Wright v. Enomoto, 462 F. Supp. 397, 402 (N.D. Cal. 1976), aff'd, 434 U.S. 1052 (1978). We take note, however, of the invitation by the United States District Court, District of Massachusetts, to reconsider the question in light of recent Supreme Court cases. See Parenti v. Ponte, supra.

[8] As the parties have not raised the question, we do not decide whether there is any limitation of the superintendent's discretion to designate "awaiting action" areas. Mass. R. A. P. 16(a), as amended, 367 Mass. 919 (1975).

may not postpone indefinitely the happening of the events that will terminate awaiting action status. Cf. *Hewitt* v. *Helms, supra* at 476 n.8; *Carlo* v. *Gunter,* 520 F.2d 1293, 1297 (1st Cir. 1975).

The United States Supreme Court has recognized that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate." *Hewitt* v. *Helms, supra* at 477 n.9. The *Hewitt* Court went on to mandate that "[p]rison officials must engage in some sort of periodic review of the confinement of [administratively segregated] inmates." *Id.* See also *id.* at 479 (Stevens, J., dissenting). The rules and regulations of the Department of Correction explicitly require the case of any inmate placed in administrative segregation in awaiting action status to be reviewed on a weekly basis. See 103 Code Mass. Regs. § 430.19(2) (1978).

The plaintiff contends that he has had no review to date and has been "warehoused" in the D.S.U. for over two years without any review.[9] Clearly, if these alleged facts are established by evidence, the plaintiff would be entitled to relief for the failure of the defendant to comply with the rules and regulations of the Department of Correction. Accordingly, the trial judge erred in dismissing the plaintiff's complaint.

The judgment is reversed and the case is remanded for trial in accordance with this opinion.

*So ordered.*

---

[9] We note that our opinion does not mean that prison administrators may conduct weekly reviews indefinitely. At some point in time, confinement, even with review, becomes unreasonable.