JOSEPH DELONG *vs.* COMMISSIONER OF CORRECTION
& others.[1]

No. 97-P-1836.

Middlesex. October 15, 1998. - February 19, 1999.

Present: LAURENCE, KAPLAN, & RAPOZA, JJ.

*Due Process of Law,* Prison classification proceedings. *Imprisonment,* Transfer of prisoner. *Practice, Civil,* Record.

Discussion of the nature of a State prisoner's "liberty interest" in freedom from restraint under the decision of *Sandin* v. *Conner,* 515 U.S. 472 (1995). [355-357]

The record of a State prison inmate's claim of civil rights violations, for correction officials' alleged violation of the prisoner's "liberty interest" in freedom from unlawful restraint, was not sufficient to support an order of summary judgment: the matter was remanded for further consideration. [357-358]

CIVIL ACTION commenced in the Superior Court Department on July 15, 1996.

The case was heard by *Sandra L. Hamlin,* J., on motions for summary judgment.

*Joseph DeLong,* pro se.

*Heidi D. Handler* for the defendants.

KAPLAN, J. An inmate of State prison (since paroled) sued certain correction officers alleged to have been responsible for treating him illegally — for violating his "liberty interest" — and claimed money damages pursuant to the civil rights statute, 42 U.S.C. § 1983 (1994). The parties cross-moved for summary judgment. A judge of the Superior Court denied the

---

[1]Larry E. DuBois is sued individually and as Commissioner of Correction. The other defendants, also sued individually and in their official capacities, are Ronald Duval, superintendent, Massachusetts Correctional Institution (M.C.I.), Cedar Junction; Mark Powers, deputy superintendent, M.C.I., Cedar Junction; Cherry Elliot, unit team manager, modular unit, M.C.I., Cedar Junction.

plaintiff's motion and allowed the defendants' motion and entered judgment dismissing the complaint. Upon the plaintiff's appeal, we find inadequacies in the record and a failure to carry out the analysis required by *Sandin* v. *Conner*, 515 U.S. 472 (1995) (5-4 decision). Accordingly, we vacate the judgment and remand the action to the Superior Court for reconsideration of the motions for summary judgment with the benefit of additional data that may be supplied by the parties.

*The record.* To begin, just before November 6, 1995, the plaintiff was then resident in Massachusetts Correctional Institution (M.C.I.), Cedar Junction. The defendants seem to be saying that the plaintiff was housed at the time in a "modular unit" of the prison, a unit evidently with severe restrictions, whereas the plaintiff says he was in Bristol I block in "awaiting action" status. He also says he was then in "general population" of Cedar Junction. On November 6, 1995, the plaintiff was transferred from Cedar Junction to general population in M.C.I., Shirley, a medium security facility.

The defendants, on their part, do not describe how the transfer to M.C.I., Shirley, was authorized. According to the plaintiff, supported by a copy of an official document, a classification hearing took place on October 23, 1995, and eventuated in a recommendation that the plaintiff be transferred to Old Colony Correction Center. This was modified by the defendant Mark Powers, deputy superintendent of M.C.I., Cedar Junction, on October 27, 1995, to recommend transfer to M.C.I., Shirley, and the latter decision was in turn approved by higher authority. Thus the transfer apparently was not a casual one. It was deliberated and considered on three levels. The transfer took place on November 6, 1995.

On November 8, however, the defendant was returned to Cedar Junction. The motion judge writes the transfer was " 'for administrative reasons' that are not explained in the record." But the defendants do attempt to explain the transfer as resulting from the coming to light that the plaintiff had taken part in a racial uprising a year earlier, on October 18, 1994, and was a leader of white inmates.[2] At other points in the record, the transfer is called an "error" that was immediately corrected. The defendant Ronald Duval, superintendent of M.C.I., Cedar Junction, says that because of the plaintiff's security status (not

---

[2]The plaintiff responds that he was found (administratively) not guilty on a charge arising from the incident. The prison authorities, however, refer to the defendant as a known ringleader of white racists.

here clearly described) and his attempted escapes in the year 1980, M.C.I., Shirley, persuaded the Department of Correction central classification office to have the plaintiff returned to Cedar Junction. His return on November 8 to Cedar Junction was not to general population but to the modular unit. No classification (or other) hearing occurred. The plaintiff complains he was not advised of any reason for his transfer to the modular unit.

Conditions at the modular unit are characterized by the plaintiff as "punitive segregation" and "total isolation" with confinement to cell twenty-four hours a day. The plaintiff sets out certain amenities of which he says he was deprived. Duval differs from the plaintiff on a few of these points, and he explains the plaintiff's exclusion from outdoor recreation by the need to avoid the plaintiff's encountering persons involved in the event of October 18, 1994. The plaintiff concedes on a couple of Duval's corrections. On the whole, the record does not provide us with a reasonably intelligible picture of the plaintiff's actual conditions of confinement.

The plaintiff remained at the modular unit for 197 days, until May 22, 1996, when he was transferred to M.C.I., Shirley, in general population. This was the recommendation of a classification hearing of April 17, 1996, which was, according to the defendants, a regular six-month classification hearing under 103 Code Mass. Regs. § 420.09(1) (1995).

Sandin *analysis*. Before the *Sandin* decision (1995), the question whether an inmate had a "liberty interest," created by State law, to avoid a particular deprivation or punishment at the hands of prison officials, was decided by considering whether the State statutes or regulations had mandatory or commanding language that confined the officials' discretion in the matter: if the answer was yes, the inmate would be held entitled to procedural due process in the formulation of the officials' decision to impose that treatment upon him. The *Sandin* case signaled a rather different approach. "States may under certain circumstances create liberty interests which are protected by the Due Process Clause," the Court said, but "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 483-484.

It was possible to surmise that the *Sandin* rule would result in fewer effective resorts by inmates to the courts than in the past. But *Sandin* does not invite a merely perfunctory or superficial comparison of the questioned deprivation with the ordinary incidents of prison life. On the contrary, the majority opinion attends first to the conditions of confinement suffered by the inmate and complained of on the ground that these were imposed on him without the due process prescribed in *Wolff* v. *McDonnell*, 418 U.S. 539, 557-558 (1974). The Court compares the conditions of confinement — in *Sandin* it was a disciplinary segregation — with the conditions in the "general population" of the prison, as well as with "administrative segregation and protective custody," and again with a "range of confinement to be normally expected for one serving an indeterminate term of 30 years to life [Conner's sentence]." 515 U.S. at 486-487.[3] The Court was also concerned with the duration of the questioned confinement (thirty days in *Sandin*) and with the possible bearing that confinement might have on the period the inmate would have to serve on his sentence.[4]

The comparative analysis in *Sandin* is dependent on factual particulars. Not surprisingly, therefore, we find the United States Court of Appeals for the Second Circuit saying in *Miller* v. *Selsky*, 111 F.3d 7, 9 (2d Cir. 1997), "*Sandin* did not create a *per se* blanket rule that disciplinary confinement may never implicate a liberty interest. Courts of appeals in other circuits have apparently come to the same conclusion, recognizing that district courts must examine the circumstances of a confinement to determine whether that confinement affected a liberty interest. [See footnote for cases cited.[5]] . . . If the district court [on

---

[3]Judge Wald has commented on the imprecision of the *Sandin* formula of comparison. For example, for that purpose is it conditions in the various types of confinement in the inmate's prison that count, or may reference be made to perhaps more stringent types of confinement in other prisons in the State? See *Brown* v. *Plaut*, 131 F.3d 163, 169 (D.C. Cir. 1997). Judge Posner suggests that one might look to prisons outside the State to which inmates might lawfully be transferred, though he doubts the Court had that in mind. See *Wagner* v. *Hanks*, 128 F.3d 1173, 1175-1176 (7th Cir. 1997). The dissenting opinions in *Sandin*, 515 U.S. at 488 (Ginsburg, J.), and 491 (Breyer, J.), also remark on difficulties with the majority's formula. *Id.* at 490 n.2 & 496.

[4]The Court on the *Sandin* facts ruled that the inmate had not shown a liberty interest as newly defined. For general analysis, see Supreme Court, 1994 Term — Leading Cases, 109 Harv. L. Rev. 111, 141-150 (1995).

[5]The court cites, as examples, *Kennedy* v. *Blankenship*, 100 F.3d 640, 642-

the remand ordered in Miller's § 1983 action] reaffirms the grant of the motion [for summary judgment in favor of the defendant prison officials] on the ground that Miller's confinement did not impose an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life,' the ruling shall identify specific facts that support this conclusion."

Although blanket per se rules will be suspect under the *Sandin* decision, there will, no doubt, be many instances where the situations of record, including comparative elements, will be clear on their face and summary judgment or a like disposition will be called for and readily justified. The courts in our locality appear to have acted on pretty clear facts when they held for the prison authorities in *Dominique* v. *Weld*, 73 F.3d 1156, 1160-1161 (1st Cir. 1996); *Hastings* v. *Commissioner of Correction*, 424 Mass. 46, 50-52 (1997); *Torres* v. *Commissioner of Correction*, 427 Mass. 611, 617-619 (1998); '*Abdullah* v. *Secretary of Pub. Safety*, 42 Mass. App. Ct. 387, 389-391 (1997).[6] The case at bar, however, could not rightly be disposed of summarily in favor of the prison authorities or against them because the record is incomplete.[7] It lacks the factual wherewithal for comparing — to follow the comparisons made in *Sandin* — the conditions suffered by the plaintiff in the modular unit for 197 days (conditions themselves not yet well described of record) with existing conditions of the general population, of other forms of segregation, and of the range of confinement expected for inmates serving the same sentence as the plaintiff. (Indeed, the record does not clearly reveal what was the plaintiff's sentence.) These missing data may be supplied on remand.[8]

---

643 (8th Cir. 1996); *Williams* v. *Fountain*, 77 F.3d 372, 374 n.3 (11th Cir.), cert. denied, 519 U.S. 952 (1996); *Whitford* v. *Boglino*, 63 F.3d 527, 533 (7th Cir. 1995); *Keenan* v. *Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996). The court adds "But cf." *McGuinness* v. *Dubois*, 75 F.3d 794, 797 n.3 (1st Cir. 1996) (per curiam). The language of this opinion does sound peremptory, but we doubt the authors would disagree with the quotation in text from the *Miller* case.

[6]Despite Judge Wald's analytic difficulties with the *Sandin* case (note 3, *supra*), see her easy ruling on the facts of record (against the inmate) in *Neal* v. *District of Columbia*, 131 F.3d 172, 175 (D.C. Cir. 1997), cert. denied, 119 S. Ct. 46 (1998).

[7]In their brief the defendants try to escape the entire issue of liberty interest: they say the plaintiff DeLong waived any due process claim. In fact the record is awash with the plaintiff's assertion of such a claim.

[8]A few unsettled incidental matters may also be resolved: the plaintiff's

When the record is supplemented the judge will perhaps be in a position to decide the case quickly and confidently, as could happen in *Dominique* and other cases above cited.

The judgment is vacated and the action is remanded for reconsideration of the motions for summary judgment upon the existing record with additional evidence that may be offered by the parties.

*So ordered.*

status just before November 6, 1995; the reason for the transfer on November 8; the lapse of time before the final hearing.