LONNIE L. GILCHRIST, JR. *vs.* COMMISSIONER OF CORRECTION
& others.[1]

No. 97-P-1792.

Suffolk. February 10, 1999. - October 8, 1999.

Present: WARNER, C.J., SMITH, & SPINA, JJ.

*Imprisonment,* Enforcement of discipline, Transfer of prisoner. *Due Process of Law,* Prison disciplinary proceedings, Hearing.

On the record of an action brought by a prisoner seeking injunctive relief and damages for the failure of the Department of Correction to provide a hearing before transferring the prisoner to a more restrictive section of prison, the prisoner was not entitled to a grant of summary judgment; the matter was remanded for further proceedings to fully explore the underlying facts. [64-66]

CIVIL ACTION commenced in the Superior Court Department on November 4, 1993.

Following a hearing before *Charles T. Spurlock,* J., and an appeal to this court, the case was remanded to the Superior Court Department and heard by *Maria I. Lopez,* J., on motions for summary judgment.

*Charles M. Wyzanski* for the defendants.

*Phillip Kassel* for the plaintiff.

WARNER, C.J. The plaintiff, Lonnie Gilchrist, an inmate in the custody of the Department of Correction, brought this suit in 1993 after his transfer to a section of the Massachusetts Correctional Institution (M.C.I.), Cedar Junction, designated as Phase III, from a less restrictive section of that facility. In his

---

[1]Larry E. Dubois is sued individually and as Commissioner of Correction. The other parties, also sued individually and in their official capacities, are Ronald Duval, superintendent of M.C.I., Cedar Junction; Mark Powers, deputy superintendent of M.C.I., Cedar Junction; James Saber, Suffolk unit team manager; and Paul Gordon, Suffolk unit team sergeant.

unverified complaint,[2] filed pro se, he claimed .that the defendants' failure to provide him a pretransfer hearing violated State regulatory and statutory requirements, as well as his rights under both the Federal and State Constitutions. He sought injunctive relief and damages. The parties filed cross motions for summary judgment. A judge in the Superior Court granted the defendants' motion for summary judgment and denied the plaintiff's motions for summary judgment and for injunctive relief.

The plaintiff filed a notice of appeal on June 6, 1994, and obtained legal counsel. On September 6, 1995, the parties moved jointly to remand the case to the Superior Court on the ground that in the recent case of *Sandin* v. *Conner*, 515 U.S. 472 (1995), the United States Supreme Court had changed the analysis for determining whether a prisoner claiming denial of procedural due process has a protected "liberty interest" under Federal law.[3] This court remanded the case for determination of the plaintiff's due process claims and his claims for damages.[4]

A second Superior Court judge issued a decision on November 20, 1995. She determined that the department had violated its own regulations as well as the plaintiff's right to procedural due process by transferring him without a hearing. She further determined that it was not clear, under the law as it existed at the time, that the defendants were violating the plaintiff's rights. She ruled that the defendants were therefore protected from providing the plaintiff money damages under the doctrine of qualified immunity. She granted the defendants' motion for summary judgment on the issue of qualified immunity and denied their summary judgment motion on the due process is-

---

[2]The complaint is titled "Verified Complaint," but no verification appears in the record.

[3]*Sandin* v. *Conner*, 515 U.S. 472, 484 (1995), held that prisoners have a liberty interest in "freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." See *Hastings* v. *Commissioner of Correction*, 424 Mass. 46, 50-52 (1997). For an extended discussion of the *Sandin* analysis, see *DeLong* v. *Commissioner of Correction*, 46 Mass. App. Ct. 353, 355-358 (1999).

[4]This court further ordered the Superior Court to determine whether the plaintiff's claims were moot, since he had been moved out of M.C.I., Cedar Junction, while his appeal was pending, and the levels of restriction at the facility had been reduced from three to two. By the time the Superior Court rendered its decision on November 20, 1995, the plaintiff had been returned to M.C.I., Cedar Junction, and the judge determined that he had a personal stake in the litigation. Regarding the reduction to two levels of restriction, the parties and the judge agreed that it had resulted in only minor alterations.

sue. She granted the plaintiff's motion for summary judgment on the issue of due process and denied his motion on the qualified immunity issue.

On January 5, 1996, the judge issued a declaratory judgment stating that placement of prisoners in restrictive confinement, previously designated as Phase III, and, subsequently, as Phase I, at M.C.I., Cedar Junction, absent compliance with 103 Code Mass. Regs. §§ 421.01 et seq. (1994)[5] was illegal and violated their Federal and State procedural due process rights. She enjoined the defendant from retaining the plaintiff in restrictive confinement absent compliance with the regulations. On May 31, 1996, the judge issued an amended judgment (entered June 7, 1996), incorporating the declaration of rights and injunction issued on January 5, 1996. The defendants filed a notice of appeal on June 13, 1996; the plaintiff, on July 23, 1996.

On August 19, 1996, the judge found the defendants in contempt for having transferred the plaintiff to restrictive confinement on February 2, 1996, without complying with the procedural requirements of 103 Code Mass. Regs. §§ 421.01 et seq.[6] Additionally, she issued an order clarifying and amending the January 5 declaration of rights and injunction to specify that the injunction applied not only to the plaintiff, but also to "any" prisoner in restrictive confinement. The contempt order was stayed pending appeal.[7]

We conclude that the plaintiff was not entitled to summary judgment on this record. The grant of summary judgment to the plaintiff must be reversed, and the declaration of rights and injunction that followed vacated. Whether the defendants are entitled to qualified governmental immunity depends upon what

[5]Sections 421.01 et seq. of 103 Code Mass. Regs. (1994) govern departmental segregation units (D.S.U.s), which formerly housed disruptive inmates. D.S.U.s and their governing regulations are discussed in part 2, *infra*.

[6]Although the plaintiff was given a disciplinary hearing on February 9, 1996, the judge found that the hearing did not comport with the requirements of 103 Code Mass. Regs. §§ 421.01 et seq. (1994).

[7]The plaintiff brought his contempt petition on behalf of four other prisoners, not parties to his suit, in addition to himself. The other prisoners claimed to be " 'adversely affected by the same or similar practice or procedure' as plaintiff pursuant to G. L. c. 231A, § 5." The judge denied the petition as to the other prisoners on the ground that the injunction she issued on January 5, 1996, may not have clearly communicated its applicability to prisoners other than Gilchrist. The defendants have not appealed from the contempt order.

rights, if any, the plaintiff was denied. Additional fact finding is necessary in order to make this determination. Therefore, the grant of summary judgment for the defendants on the issue of qualified immunity must also be reversed.

1. *Undisputed facts.* We summarize the undisputed facts. Three prison stabbings in June, 1993, and a fight on July 13, 1993, led to a "lock-down" at M.C.I., Cedar Junction. All inmates were temporarily confined to their cells. The superintendent ended the lock-down and installed the "phase system" on August 9, 1993, partly as a result of the escalating violence that had been occurring at the institution. Inmates were assigned to one of three phases, each permitting different degrees of mobility, access to programs, and other privileges. Phase III was the most restrictive, Phase I the most liberal. The system's purpose was to limit the movement of the most disruptive inmates and to encourage inmates to follow institutional rules and refrain from violence. Inmates who behaved well could expect to move to a less restrictive phase. Those who did not would remain in, or be transferred to, a more restrictive phase.

In the course of this litigation, the three-phase system was changed to a two-phase system, with Phase I as the most restrictive phase. The two phases were subsequently renamed "East Wing" and "West Wing." To avoid confusion, the term "restrictive confinement" will refer to the most restrictive section under each of the nomenclatures.

The plaintiff, who had a history of disciplinary problems in prison, was confined to his cell during the lock-down instituted on July 13, 1993. The department concedes that he was given no prior hearing. He remained in restrictive confinement from August 9, 1993, when the phase system was introduced, to April 18, 1995. After several transfers, during which he was housed in less restrictive units, he refused to enter the general population at Old Colony Correctional Center, claiming that he needed a single cell because of the nature of his crime. He was returned to restrictive confinement on November 3, 1995. He was reassigned to less restrictive custody on January 24, 1996, but was again returned to restrictive confinement on February 2, 1996, pending a disciplinary hearing for his refusal to report for an interview for a kitchen job. He was found guilty after the hearing and sanctioned with two weeks' loss of radio, television, canteen, and telephone privileges. His appeal of the guilty finding to the superintendent was denied as being without merit.

It was then decided that he should remain in restrictive confinement.

2. *Questions of material fact remain.* The judge found that conditions in restrictive confinement were substantially similar to those in departmental segregation units (D.S.U.s). D.S.U.s had been, but were no longer being, used to provide administrative segregation for disruptive inmates. Disruptive inmates were now being placed either in restrictive confinement or in the departmental disciplinary unit for punishment. Regulations governing D.S.U.s require that inmates transferred to D.S.U.s be given procedural protections, including notice and the opportunity to be heard. 103 Code Mass. Regs. §§ 421.09-421.17 (1994).[8] The judge concluded that, because inmates transferred to restrictive confinement were subjected to substantially similar conditions as inmates housed in D.S.U.s, the former were entitled to the procedural protections afforded by the regulations governing D.S.U.s.

The judge correctly reasoned that whether or not the plaintiff was entitled to the procedural protections set out in the regulations governing D.S.U.s depended upon whether his "placement in [restrictive confinement] . . . was shown to be the substantial equivalent of his being placed in a . . . D.S.U." *Longval* v. *Commissioner of Correction*, 404 Mass. 325, 328 (1989). See *Royce* v. *Commissioner of Correction*, 390 Mass. 425, 429-30 (1983); *Martino* v. *Hogan*, 37 Mass. App. Ct. 710, 721 (1994). However, here, as in *Longval*, 404 Mass. at 330, the grant of summary judgment must be reversed because the plaintiff has not shown "that there was no dispute of material fact concerning the substantial similarity of [the] two units."

The judge determined that D.S.U.s. and restrictive confinement were essentially similar by comparing provisions set out in the State-wide regulations governing D.S.U.s[9] with the M.C. I., Cedar Junction, operating guidelines set out in the

---

[8]These requirements appear in both the 1990 and the 1994 versions of the regulations.

[9]The judge relied on certain provisions appearing in 103 Code Mass. Regs. §§ 421.20-421.21. These sections concern operating procedures and programs in D.S.U.s. The 1990 version of the regulations was in effect when the plaintiff was initially transferred to restrictive custody in 1993. The 1994 version of the regulations went into effect while he was still in restrictive custody and has remained in effect through the time he was again placed in restrictive confinement, on February 2, 1996, to the present. Both versions contain similar provisions.

Inmate Orientation Handbook (September 29, 1993), updated by a June 2, 1995, memorandum describing the new two-phase system. As was the case in *Longval,* see 404 Mass. at 329, the record does not include specific guidelines for the operation of the D.S.U. at M.C.I., Cedar Junction.[10]

The Supreme Judicial Court has recognized that "the department and the commissioner may not sidestep statutory and regulatory provisions stating the rights of an inmate as to his placement in a D.S.U. by assigning as a pretext another name to such a unit." *Longval* v. *Commissioner of Correction,* 404 Mass. at 328-329, citing *Royce* v. *Commissioner of Correction,* 390 Mass. at 429-430. See *Martino* v. *Hogan,* 37 Mass. App. Ct. at 721. It is noteworthy that in July, 1996, the superintendent of M.C.I., Cedar Junction, filed an affidavit contending that it would be unduly burdensome to require the department to provide D.S.U. hearings to the "approximately 419" inmates housed in restrictive custody. He stated that no initial D.S.U. hearings had been held for the previous four years. The superintendent's statement highlights the question at issue — whether inmates are now being housed under D.S.U.-like conditions without being afforded the procedures mandated by D.S.U. regulations. This question is particularly troubling in view of the department's history regarding D.S.U.s, as evidenced in *Hoffer vs. Fair,* SJC No. 85-71 (March 3, 1988).

Nevertheless, the factual material upon which the judge based her conclusion — the State-wide regulations governing D.S.U.s and the operating guidelines for M.C.I., Cedar Junction — while indicating that the restrictions imposed on the two groups of inmates may be equally harsh, does not present a sufficiently full picture of their living conditions to justify the award of summary judgment. Additionally, an affidavit filed by the superintendent in support of the defendants' motion for reconsideration of the summary judgment granted to the plaintiff[11] makes a minimal showing that there may be some differences in the two units. Further proceedings must be held to flesh out and more fully explore the facts. See *Quincy Mut. Fire Ins. Co.* v. *Abernathy,* 393 Mass. 81, 87 (1984). The issues in

---

[10]Title 103 Code Mass. Regs. § 421.20 (1990) required the administrator of a D.S.U. to establish procedures for the operation of that unit within thirty days of the designation of the area as a D.S.U. The 1994 version of the regulations contains the same provision.

[11]The judge denied the motion for reconsideration after a hearing.

this case are too weighty to end the action at this early stage. Cf. *Phelps* v. *MacIntyre*, 397 Mass. 459, 461 (1986).

The portion of the amended judgment dated May 31, 1996, and entered June 7, 1996, granting summary judgment to the plaintiff on the due process claims and to the defendants on the issue of qualified immunity is reversed, and the declaration of rights and injunction set out in the judgment are vacated. In view of our decision, the Superior Court should vacate the contempt order on remand and conduct further proceedings consistent with this opinion.

*So ordered.*