NORMAN L. LONGVAL vs. COMMISSIONER OF CORRECTION
& others[1] (and a companion case[2]).

Suffolk. January 3, 2007. - February 23, 2007.

Present: GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Res Judicata. Due Process of Law,* Class action, Prison classification proceed-
ings, Prison regulation. *Governmental Immunity. Imprisonment,* Reclassifica-
tion of prisoner, Transfer of prisoner. *Constitutional Law,* Imprisonment.
*Administrative Law,* Regulations.

Principles of claim preclusion did not bar inmates, members of a certified plain-
tiff class in a successful action for declaratory and injunctive relief, from
bringing a subsequent action seeking compensatory and punitive damages
for particularized personal injury unsuitable for class treatment. [416-418]
In actions filed by inmates at a State prison, seeking compensatory and punitive
damages for time spent in segregated confinement for nondisciplinary
reasons, the judge did not err in allowing motions to dismiss in favor of the
defendant government officials on the grounds of qualified immunity, where,
at the time the defendants had assigned the inmates to segregated confine-
ment, it remained a legitimate factual question whether the conditions under
which the plaintiffs were held were sufficient to make compliance with the
relevant regulations mandatory, as a matter of clearly established State law,
before inmates were placed there. [418-424]

CIVIL ACTIONS commenced in the Superior Court Department
on April 24, 1998, and October 28, 2002.

Motions to dismiss were heard by *Thomas P. Billings,* J.

The Supreme Judicial Court on its own initiative transferred
the cases from the Appeals Court.

*Stephen B. Hrones (Michael Tumposky* with him) for Norman
L. Longval & another.

---

[1]Additional defendants, sued individually and in their official capacities,
include the Secretary of Public Safety, the former commissioner of correction,
the superintendent of the Massachusetts Correctional Institution at Cedar
Junction, and various employees or officials at the Old Colony Correctional
Center. The commissioner is also sued individually.

[2]Andrew Kilburn *vs.* Commissioner of Correction & another.

*Julie E. Daniele* (*Wendy Weber* with her) for Commissioner of Correction & another.

*James R. Pingeon,* for Massachusetts Correctional Legal Services, amicus curiae, submitted a brief.

GREANEY, J. The plaintiffs in these cases were members of the certified plaintiff class in *Haverty* v. *Commissioner of Correction,* 437 Mass. 737 (2002) (*Haverty*), an action for declaratory and injunctive relief, in which we held that inmates at the Massachusetts Correctional Institution at Cedar Junction (Cedar Junction) must be afforded the due process procedures set forth in the regulatory scheme governing the former departmental segregation unit (DSU), 103 Code Mass. Regs. §§ 421.00 (1994) (DSU regulations), before being segregated in restrictive conditions in the so-called East Wing of the prison for non-disciplinary reasons. *Id.* at 762-763. In separate actions filed in the Superior Court, the plaintiffs sought compensatory and punitive damages for the time they spent confined in the East Wing alleging that they had been deprived of the procedural safeguards to which they were entitled. The defendants raised, by means of motions to dismiss filed pursuant to Mass. R. Civ. P. 12 (b), 365 Mass. 754 (1974), the affirmative defenses of res judicata and qualified immunity. After hearing arguments on both motions, a judge in the Superior Court concluded that the plaintiffs' claims for damages were not barred by their prior class action for declaratory and injunctive relief. The judge, however, allowed the defendants' motions on the ground of qualified immunity, concluding that the defendants had not violated "clearly established statutory or constitutional rights" when they assigned prisoners to the East Wing in disregard of the DSU regulations. The parties filed cross appeals, and the appeals were consolidated in the Appeals Court. We transferred the cases here on our own motion and now affirm the judgments of dismissal.

1. A description of the background events precipitating these appeals is recited in full in *Haverty.* See *id.* at 741-747. We summarize the material facts. Litigation challenging conditions in the State correctional system, in which inmates were held in near solitary confinement in the DSU at Cedar Junction and at the Massachusetts Correctional Institution at Norfolk, for

indeterminate periods of time and for reasons other than disciplinary sanctions, resulted in a single justice of this court directing the department to promulgate new regulations, applicable to all State correctional facilities, governing the transfer of inmates from the general prison population to any DSU unit. See Hoffer *vs.* Fair, No. SJ-85-0071 (Mar. 3, 1988). In 1993, those regulations were enacted and are now codified at 103 Code Mass. Regs. §§ 421.00.[3]

In 1995, in response to escalating levels of gang-related incidents, and an increasingly violent prison population throughout the department, the commissioner decided to eliminate use of the DSU and to divide Cedar Junction (at that time the Commonwealth's only maximum security prison) into two "wings," the East Wing and the West Wing.[4] The East Wing consists of eight units, each with forty-five one-man cells; the West Wing has three units, each with seventy-two one-man cells. Conditions are materially more restrictive in the East Wing. There, inmates are held in virtual solitary confinement for twenty-two and one-half hours each day; have only limited recreational time and few job opportunities; and eat all meals in

---

[3]The new regulations, which replaced regulations formerly applicable to the DSU, "establish rules whereby an inmate may be confined to a Departmental Segregation Unit [DSU] because his continued presence in a general institution population would be detrimental to the program of the institution." 103 Code Mass. Regs. § 421.01 (1994). The provisions set forth substantive criteria that must be met before placement of any prisoner in a DSU, see 103 Code Mass. Regs. §§ 421.07, 421.09 (1994), and set forth procedural rights that must be afforded any prisoner so placed. See 103 Code Mass. Regs. §§ 421.10, 421.11 (1994) (right to written notice and representation by counsel at a hearing before DSU board; right to assistance in preparing for hearing, in some instances when counsel not obtained; right to tape recording of hearing). See also 103 Code Mass. Regs. §§ 421.18, 421.19 (1994) (right to review of status every ninety days; right to written monthly evaluations summarizing behavior and recommendations for release from DSU). In *Haverty* v. *Commissioner of Correction,* 437 Mass. 737 (2002) (*Haverty*), we noted that the regulations were specifically designed to "cabin the power of the prison officials to isolate any prisoner (including those in maximum security conditions) from other prisoners based solely on the subjective evaluation of the prisoner by the prison authorities." *Id.* at 745 n.16.

[4]When the commissioner then sought to repeal the DSU regulations, the single justice who had ongoing jurisdiction in the case of Hoffer *vs.* Fair, No. SJ-85-0071 (Sept. 26, 1995), allowed a motion by the plaintiffs in that case to enjoin the proposed repeal.

their cells.[5] Inmates housed in the West Wing, by contrast, are allowed out of their cells for as much as fifteen hours each day (all day on weekends) and interact with other prisoners throughout those times. They eat meals in a communal dining hall and enjoy greater visitor privileges than those in the East Wing. Assignment to the East Wing generally is not imposed for a specific disciplinary offense, but rather to allow prison officials to maintain control of the prison population and to secure the safety of prisoners and staff. Until the time of our decision in *Haverty*, no procedural protections were provided before a prisoner was placed in the East Wing, or during the time he remained there, beyond the six-month classification review received by all prisoners in the system pursuant to 103 Code Mass. Regs. § 420.09 (1995) (entitling all prisoners housed in any correctional facility in Commonwealth, no matter the level of security, to receive review of their status every six months). Placement in the East Wing, and the amount of time a prisoner remained there, was solely at the discretion of the superintendent of Cedar Junction. See *Haverty*, *supra* at 746. The *Haverty* plaintiffs, certified as a class of "all prisoners who are now confined or may at some point be confined at [Cedar Junction] in any housing unit other than the DDU" (see note 5, *supra*), sought injunctive relief against the practice of placing prisoners in segregated confinement in the East Wing for nondisciplinary reasons, absent compliance with the DSU regulations. Relying on numerous decisions of this court, and of the Appeals Court, suggesting, in essence, that, where conditions in a segregated unit, however named by correction officials, are substantially similar to those in the DSU, the unit must be dealt with as a DSU, at least for purposes of procedural requirements, the plaintiffs contended that the conditions of isolation in the East Wing were nearly identical to those in the DSU and, therefore,

---

[5]Separate from the East and West Wings at Cedar Junction is a department disciplinary unit (DDU), where prisoners may be confined for disciplinary reasons in conformance with 103 Code Mass. Regs. §§ 430.00 (1993). The DDU is not part of these cases, nor are other segregation units, in both the East and West Wings, where inmates may be housed pending the outcome of disciplinary hearings. See *Haverty*, *supra* at 739, 742-743 & n.11. See also *Hudson* v. *Commissioner of Correction*, 431 Mass. 1, 4-5 (2000) (commissioner has broad discretion to transfer inmates, within prison system or within particular institution, for disciplinary reasons or as investigative tool).

that the department's failure fully to comply with DSU regulations before placing or transferring an inmate to the East Wing was unlawful. See, e.g., *Longval* v. *Commissioner of Correction*, 404 Mass. 325, 330 (1989) (to prevail on State due process claim, plaintiff required to show substantial similarity between DSU and administrative segregation unit at the Massachusetts Correctional Institution at Concord); *Kenney* v. *Commissioner of Correction*, 393 Mass. 28, 34 (1984) (inmate may be transferred to DSU only in compliance with departmental regulations); *Royce* v. *Commissioner of Correction*, 390 Mass. 425, 429-430 (1983) (prison officials may not abuse discretion by confining inmates in restrictive housing under "awaiting action status" as means to accomplish punishment immune to procedures set forth in [former] DSU regulations); *Gilchrist* v. *Commissioner of Correction*, 48 Mass. App. Ct. 60 (1999); *De-Long* v. *Commissioner of Correction*, 46 Mass. App. Ct. 353, 355-358 (1999); *Martino* v. *Hogan*, 37 Mass. App. Ct. 710, 721 (1994). We agreed with this position and, in a divided decision, held that the department may not lawfully place prisoners in the East Wing without first affording them the procedural protections required by the DSU regulations. See *Haverty, supra* at 740.[6] In order to effectuate our decision in "an orderly and safe manner," we remanded the case to the Superior Court to determine the timing and manner of implementing the procedures required by the regulations. See *id.* at 764.[7]

2. As the parties moving for dismissal on res judicata grounds,

[6]The *Haverty* plaintiffs also argued that the conditions of confinement in the East Wing rose to the level described by the Supreme Court of the United States, in *Sandin* v. *Conner*, 515 U.S. 472 (1995), as an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," which, the *Sandin* Court recognized, might create a liberty interest under the Fourteenth Amendment to the United States Constitution. *Id.* at 484 (setting forth new standard for determining whether there has been deprivation of liberty interest in State prison context). Our conclusion that the relief sought was warranted by the defendants' unlawful disregard of required procedures set forth in the DSU regulations made unnecessary our consideration of the plaintiffs' alternative argument based on constitutional principles set forth in the *Sandin* decision.

[7]A judge in the Superior Court subsequently ordered that "good time credit" be awarded to compensate inmates who had been unlawfully confined in the East Wing. This order was struck down by this court in *Haverty* v. *Commissioner of Correction*, 440 Mass. 1, 7 (2003).

the defendants have the burden of establishing the elements of claim preclusion. See *Kobrin* v. *Board of Registration in Med.*, 444 Mass. 837, 843 (2005). The defendants have not met their burden in this case. Although our cases in this area are few, we see no reason why the doctrine of claim preclusion would not apply to class action litigation, so that a valid, final judgment is conclusive on all of the members of a plaintiff class. See *Aspinall* v. *Philip Morris Cos.*, 442 Mass. 381, 397 n.19 (2004). The doctrine only operates, however, to bar further litigation of "all matters that were or should have been adjudicated in the [original class] action." *Heacock* v. *Heacock*, 402 Mass. 21, 23, 24 (1988) (explaining doctrine as ramification of policy considerations underlying rule against splitting cause of action). See *O'Neill* v. *City Manager of Cambridge*, 428 Mass. 257, 259 (1998). It does not apply in circumstances where a party has neither the incentive, nor the opportunity, to raise the claim in an earlier lawsuit. See *id.*, and cases cited. In *Aspinall* v. *Philip Morris Cos.*, *supra*, we suggested that, in circumstances where the unique experiences of potential members of a plaintiff class would defeat the "commonality of interests" requirement for class certification pursuant to G. L. c. 93A, principles of claim preclusion would not operate to bar a class member from future pursuit of claims for personal injury unsuitable for class treatment. The same principles of fairness and judicial efficiency hold true with respect to a class certified, as was the *Haverty* class, under Mass. R. Civ. P. 23, 365 Mass. 767 (1974), a rule which, like G. L. c. 93A, does not allow a member of a certified class not wishing to be bound by the class litigation to "opt out." See J.W. Smith & H.B. Zobel, Rules Practice § 23.2, at 94 (1975) ("the standard for binding absentees by a class action judgment is simply fundamental fairness").[8]

This position accords with Federal law.[9] In fact, it appears that "every federal court of appeals that has considered the

---

[8]We note that the plaintiff Longval did attempt to intervene in the *Haverty* lawsuit, ostensibly to litigate an asserted damage claim. The motion appears to have been filed in the Superior Court ten months after the case was argued before this court and one month before the *Haverty* decision was released. It is hardly surprising that the motion was denied.

[9]We have noted that Mass. R. Civ. P. 23, 365 Mass. 767 (1974), " 'was written in the light of the Federal rule,' *Baldassari* v. *Public Fin. Trust*, 369

question has held that a class action seeking only declaratory or injunctive relief does not bar subsequent individual suits for damages." *Hiser* v. *Franklin*, 94 F.3d 1287, 1291 (9th Cir. 1996), cert. denied, 520 U.S. 1103 (1997). See *Fortner* v. *Thomas*, 983 F.2d 1024, 1030-1032 (11th Cir. 1993) ("It is clear that a prisoner's claim for monetary damages or other particularized relief is not barred if the class representative sought only declaratory and injunctive relief, even if the prisoner is a member of a pending class action"); 18A C.A. Wright, A.R. Miller, & E.H. Cooper, Federal Practice and Procedure § 4455, at 460-464 (2d ed. 2002) ("an individual who has suffered particular injury as a result of practices enjoined in a class action should remain free to seek a damages remedy even though claim preclusion would defeat a second action had the first action been an individual suit for the same injunctive relief").

3. We turn now to the defendants' claim of qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rodriques* v. *Furtado*, 410 Mass. 878, 882 (1991), quoting *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982). See *Shedlock* v. *Department of Correction*, 442 Mass. 844, 859 (2004). The standard is entirely objective. See *Harlow* v. *Fitzgerald*, *supra* at 815-816 (subjective standard incompatible with policy rationale of precluding insubstantial lawsuits from proceeding to trial); *Clancy* v. *McCabe*, 441 Mass. 311, 322-323 (2004), quoting *Anderson* v. *Creighton*, 483 U.S. 635, 640 n.2 (1987) (objective standard promotes policy that "insubstantial claims against government officials be resolved prior to discovery and on summary judgment if possible").[10] In order to overcome an asserted defense of qualified immunity, the right

Mass. 33, 40 (1975), hence case law construing the Federal rule is analogous and extremely useful." *Weld* v. *Glaxo Wellcome Inc.*, 434 Mass. 81, 86 n.7 (2001). There is some dissimilarity, however, between the two rules. One difference, which has relevance to (but does not alter) the above analysis, is that the Federal class action rule, unlike our own, permits a judge to allow members of the class to exclude themselves. See Fed. R. Civ. P. 23 (c) (2) (B).

[10]The matter of qualified immunity usually is decided on a motion for sum-

must be clearly established at the time of the alleged violation. See *Siegert* v. *Gilley*, 500 U.S. 226, 232 (1991). To be "clearly established" for purposes of qualified immunity, the contours of the right allegedly violated must be sufficiently definite so that a reasonable official would appreciate that the conduct in question was unlawful. See *Shedlock* v. *Department of Correction*, *supra*, citing *Anderson* v. *Creighton*, *supra* at 640. The United States Court of Appeals for the First Circuit has noted that "qualified immunity sweeps so broadly that 'all but the plainly incompetent or those who knowingly violate the law' are protected from civil rights suits for money damages." *Hegarty* v. *Somerset County*, 53 F.3d 1367, 1373 (1st Cir. 1995), quoting *Hunter* v. *Bryant*, 502 U.S. 224, 229 (1991).

Analysis of the qualified immunity defense generally requires a two-part inquiry into whether, "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right," and, if so, whether the right was clearly established so that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Gutierrez* v. *Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 403-404 (2002), quoting *Saucier* v. *Katz*, 533 U.S. 194, 201, 202 (2001). In light of our holding in *Haverty*, only the second inquiry is in issue here.

As far back as 1983, a reasonable prison official would have known that a prisoner could not lawfully be assigned to the DSU without abiding by mandatory language contained in regulations, then in effect, governing the placement of prisoners in the DSU. See *Royce* v. *Commissioner of Correction*, 390 Mass. 425, 427-428 (1983) ("Once an agency has seen fit to promulgate regulations, it must comply with those regulations," citing regulations governing DSU placement then in effect, 103 Code Mass. Regs. §§ 421.01 et seq. [1978]). See also *Kenney* v. *Commissioner of Correction*, 393 Mass. 28, 34 (1984) (inmate may be transferred to DSU only in compliance with departmental

mary judgment. As has been indicated, these cases were decided on the defendants' motion to dismiss pursuant to Mass. R. Civ. P. 12 (b), 365 Mass. 754 (1974). This is acceptable in circumstances, as here, where the applicability of the qualified immunity defense is clear from allegations contained in the complaint. See *Gutierrez* v. *Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 404 (2002).

regulations). In 1989, we reaffirmed this principle and extended its application to a challenge, brought by the plaintiff Longval, to his transfer, on two occasions, to an administrative segregation unit at the Massachusetts Correctional Institution at Concord (Concord), without a hearing and the prior authorization of the commissioner, as required by G. L. c. 127, § 39, and by DSU regulations then in effect. See *Longval* v. *Commissioner of Correction*, 404 Mass. 325, 327 (1989). We held that, in order to prevail on that aspect of his summary judgment motion concerned with violations of DSU regulations, the plaintiff was required to show that there was no dispute of material fact as to the "substantial similarity" between the DSU and the administrative segregation unit in which he had been held. See *id.* at 330. We cautioned that "[c]ertainly, the department and the commissioner may not sidestep statutory and regulatory provisions stating the rights of an inmate as to his placement in a DSU by assigning as a pretext another name to such a unit." *Id.* at 328-329, citing *Royce* v. *Commissioner of Correction, supra* at 429-430.[11] In *Hoffer* v. *Commissioner of Correction*, 412 Mass. 450 (1992), we again clarified that departmental compliance with DSU regulations, before removing a prisoner from the general prison population and isolating him in the DSU, is constitutionally required and emphasized that the department's failure to so comply would, in appropriate cases, entitle a prisoner to "compensation, beyond nominal damages, for the loss of liberties which resulted from the deprivation of due process." *Id.* at 455.

In 1995, in *Sandin* v. *Conner*, 515 U.S. 472 (1995), the Supreme Court of the United States abandoned its prior methodology for analyzing claims brought by State prisoners alleging that conditions of their confinement amounted to an

---

[11]We affirmed the denial of the defendants' motion for summary judgment based on the ground of qualified immunity not, as suggested by the plaintiffs in their brief, "because the facts, taken in a light most favorable to Longval, were sufficient to show a violation of his clearly established rights," but because a determination on the qualified immunity issue "would not bar a court from declaring that Longval's rights under [State law] had been violated or from granting injunctive relief. It would only preclude the recovery of damages against the defendants." *Longval* v. *Commissioner of Correction*, 404 Mass. 325, 332 (1989). In the instant appeals, of course, it is only damages being sought by the plaintiffs.

unconstitutional deprivation of due process, and concluded that
the due process clause is implicated only when the challenged
deprivation involves an "atypical and significant hardship on
the inmate in relation to the ordinary incidents of prison life."
*Id.* at 484. See *DeLong* v. *Commissioner of Correction*, 46
Mass. App. Ct. 353, 355-358 (1999) (providing in-depth *Sandin*
analysis). In subsequent actions brought by prison inmates al-
leging due process violations for noncompliance with procedures
allegedly due them, the plaintiffs generally attempted to
demonstrate, as a factual matter, that the conditions of their
confinement imposed an "atypical and significant hardship"
that created a protected liberty interest under *Sandin* v. *Conner*,
*supra*, or that the conditions were substantially the same as
those in the former DSU and, thus, compliance with DSU
regulations was mandatory under State law.

In 1996, on consideration of a motion for summary judgment
filed by the plaintiff in *Gilchrist* v. *Commissioner of Correction*,
48 Mass. App. Ct. 60 (1999), a judge in the Superior Court is-
sued a declaratory judgment stating that placement of prisoners
in the so-called "Phase III" unit of the East Wing (a designated
restrictive unit that, apparently, was the product of organizational
changes preceding the 1995 reorganization at Cedar Junction),
absent compliance with the DSU regulations, was unlawful. See
*id.* at 62. The judge enjoined the commissioner and prison of-
ficials from placing the *Gilchrist* plaintiff in the Phase III unit
without affording him those rights contained in the DSU
regulations. See *id.* In 1999, the Appeals Court vacated the
declaration and the injunction, concluding that there was a
genuine issue whether conditions in the Phase III unit were, in
fact, the "substantial equivalent" of the DSU and remanded
the case to the Superior Court for such a determination. *Id.* at
64-66 ("the factual material upon which the judge based her
conclusion . . . while indicating that the restrictions imposed
on the two groups of inmates may be equally harsh, does not
present a sufficiently full picture of their living conditions to
justify the award of summary judgment"). In another case
decided by the Appeals Court earlier that year, *DeLong* v. *Com-
missioner of Correction*, 46 Mass. App. Ct. 353, 355, 357 (1999),
the focus was on whether the plaintiff's "punitive segregation" in

a "modular unit" at Cedar Junction imposed an "atypical and significant hardship" that would create a liberty interest under *Sandin* v. *Conner, supra.* The Appeals Court again remanded the case to the Superior Court for a factual analysis of the particular conditions of the plaintiff's confinement. See *DeLong* v. *Commissioner of Correction, supra* at 357-358. See also *Martino* v. *Hogan,* 37 Mass. App. Ct. 710, 721 (1994).

Consideration of the above cases leads us to conclude that, at the time that the plaintiffs were held in segregated confinement in the East Wing, in 1996 and throughout October, 2002, it was "clearly established" that the law required department officials to afford inmates the procedural protections contained in the DSU regulations before placing them in segregated conditions that were substantially similar to those in the former DSU. It remained a legitimate factual question, however, whether the *conditions* in the East Wing, under which the plaintiffs were held, sufficiently mirrored those in the former DSU so as to make compliance with the DSU regulations mandatory, as a matter of "clearly established" State law, before prisoners were placed there.[12] While *Haverty* resolved that question, the defendants could have reasonably (but we now know mistakenly) concluded, prior to October 10, 2002, the date the *Haverty* opinion was issued, that the law did not compel their compliance with the DSU regulations.[13] Even then, in a strongly worded dissent in *Haverty,* three Justices

[12]In August of 1996, a judge in the Superior Court found the defendants in contempt for having transferred the plaintiff in *Gilchrist* v. *Commissioner of Correction,* 48 Mass. App. Ct. 60 (1999), to a "restrictive confinement" in the "Phase III" unit at Cedar Junction in defiance of her prior order enjoining the defendants from doing so without compliance with the DSU regulations. The contempt order was stayed pending appeal. See *id.* at 62. As stated above, the Appeals Court concluded that summary judgment had not properly entered on the plaintiff's claims and, in remanding the case to the Superior Court, suggested that the contempt order be vacated. See *id.* at 66. Even assuming identical conditions in the Phase III unit and the East Wing, for purposes of this case, we can state with confidence that the applicability of DSU regulations to the East Wing was not a "clearly established" principle of law before, or after, any of the cases decided before *Haverty.* As we explained in *Shedlock* v. *Department of Correction,* 442 Mass. 844, 861 n.13 (2004), "the issue whether a statutory right is 'clearly established' for purposes of overcoming qualified immunity *is not* a matter of counting up the number of decisions that have gone each way and treating as 'clearly established' whichever position has garnered the greatest number of opinions in support." *Id.* at 861 n.13.

[13]We take note of the fact, as did the Superior Court judge in *Haverty,* that

of this court stood by the position that DSU regulations were not applicable to the East Wing and that the court's holding otherwise was, in fact, "contrary to their purpose and the judicial and regulatory history leading to their enactment." *Haverty, supra* at 764 (Cordy, J., dissenting, with whom Cowin and Sosman, JJ., joined). Although the dissenting Justices acknowledged points of similarity between conditions in the East Wing and the DSU, they also argued the existence of what were, in their views, significant and material differences between the two units. See *id.* at 767-768 (Cordy, J., dissenting, with whom Cowin and Sosman, JJ., joined).

In *Haverty*, we declared in unambiguous terms that compliance with DSU regulations is mandatory, under State law, before prison officials may transfer a prisoner to the East Wing. See *id.* at 762-763. If Justices on this court reasonably could differ as to whether conditions in the East Wing call DSU regulations into play, however, it cannot fairly be said that a reasonable official would have understood their applicability. In the wake of *Haverty*, when a different member of the *Haverty* plaintiff class, Kevin Dahl, sought monetary compensation, pursuant to 42 U.S.C. § 1983 (2000), for his invalid confinement in the East Wing absent compliance with DSU regulations, the Appeals Court, in an unpublished memorandum of decision, concluded that qualified immunity was available to the defendants because the law, before our decision in *Haverty*, was not "clearly established." See *Dahl* v. *Commissioner of Correction*, 61 Mass. App. Ct. 1118 (2004). This result was so obvious that the

---

decisions in Superior Court cases alleging substantial similarities between conditions in the East Wing and in the DSU had been split and, thus, cannot stand for the proposition that the law in this area was "clearly established." The judge stayed his decision requiring the defendants to provide procedural protections pursuant to the DSU regulations and, so that the defendants could appeal from his decision, issued an order for entry of a separate and final judgment. In his order, the judge acknowledged that he had "been informed that the due process issues in this case are similar to the due process issues raised in another case heard in the Superior Court, Tibbs *vs.* Duval (Superior Court No. MICV1997-05295 [May 11, 1998]), where the judge made a ruling contrary to my decision in this case." See Johnson *vs.* Dubois, Superior Court No. MICV1995-01385 (Sept. 24, 1996) (finding that inmates' confinement in West Wing segregation unit, pending outcome of disciplinary hearings, did not offend due process clause because, among other reasons, that unit was not "functional equivalent" of DSU).

Justices on the panel decided the appeal under the court's rule 1:28, a matter of disposition reserved for cases and issues lacking substantial merit. The conclusion in the *Dahl* case was correct. Based on the law discussed, the defendants have the benefit of qualified immunity.

4. The judgments of dismissal are affirmed.

*So ordered.*