WILLIAM HAVERTY & others[1] *vs.* COMMISSIONER OF
CORRECTION & another[2] (and a companion case[3]).

Suffolk. November 8, 2001. - October 10, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Imprisonment,* Enforcement of discipline, Reclassification of prisoner, Transfer
of prisoner, Segregated confinement. *Practice, Civil,* Summary judgment.
*Due Process of Law,* Prison classification proceedings, Prison disciplinary
proceedings, Prison regulation. *Constitutional Law,* Imprisonment. *Admin-
istrative Law,* Regulations.

This court concluded that officials at the Massachusetts Correctional Institu-
tion at Cedar Junction were required to comply with departmental segrega-
tion unit (DSU) regulations, 103 Code Mass. Regs. §§ 421.00, duly
enacted and still in effect despite the official closure of the DSU at Cedar
Junction, before placing certain prisoners in segregated confinement for
nondisciplinary reasons in the so-called East Wing of the facility, where
the severely restrictive conditions of confinement in the East Wing were so
substantially similar to those in the former DSU that due process protec-
tions were warranted. [753-764] CORDY, J., dissenting, with whom COWIN
and SOSMAN, JJ., joined.

CIVIL ACTION commenced in the Superior Court Department on
June 30, 1995.

The case was heard by *Charles M. Grabau,* J., on motions
for summary judgment, and entry of separate and final judg-
ment was ordered by him.

The Supreme Judicial Court granted an application for direct
appellate review.

*Joel J. Berner* for the defendants.

*Phillip Kassel* for the plaintiffs.

---

[1]David Cosme, Robert Grady, Mark Gentile, Israel Luna, Ricardo Feliciano,
and Felix Morales.

[2]Superintendent of the Massachusetts Correctional Institution at Cedar
Junction.

[3]Lonnie Gilchrist *vs.* Commissioner of Correction, consolidated in the
Superior Court. See note 21, *infra.*

MARSHALL, C.J. This appeal presents, in yet another form, the chronic controversy generated by the tension between efforts by the Commissioner of Correction (commissioner) to manage our prison system, and claims by prisoners for protection from alleged violations of their constitutional and statutory rights.[4] This clash also arises, as here, in efforts to reconcile the interests served by punishment: deterrence, isolation and incapacitation, retribution and moral reinforcement, and reformation. See *Cepulonis* v. *Commonwealth*, 384 Mass. 495, 499 (1981), citing *Commonwealth* v. *O'Neal*, 369 Mass. 242, 251 & n.11 (1975) (Tauro, C.J., concurring). See also Fried, Reflections on Crime and Punishment, 30 Suffolk U. L. Rev. 681 (1997).

At issue is whether the defendants — the commissioner and the superintendent of the Massachusetts Correctional Institution at Cedar Junction (Cedar Junction) (superintendent) — can ignore regulations, duly enacted and still in effect, which govern the placement of prisoners in segregated confinement for non-disciplinary reasons.

Litigation, commenced in 1985, resulted in a single justice of this court ordering the adoption of regulations that require procedural protections before a prisoner can be isolated for non-disciplinary reasons. See *Hoffer vs. Fair*, No. SJ-85-0071 (Mar. 3, 1988). See also 103 Code Mass. Regs. §§ 421.00 (1993). In 1995, the commissioner attempted to repeal those regulations in the wake of a lockdown of Cedar Junction following a disturbance. The commissioner was unsuccessful, and a single justice enjoined the repeal of the regulations on September 26, 1995. Notwithstanding the 1995 injunction, the commissioner and the superintendent thereafter implemented certain operational changes at Cedar Junction, the effect of which was to place a substantially increased number of prisoners in segregated

---

[4]See, e.g., *Hudson* v. *Commissioner of Correction*, 431 Mass. 1 (2000); *Torres* v. *Commissioner of Correction*, 427 Mass. 611 (1998); *Hastings* v. *Commissioner of Correction*, 424 Mass. 46 (1997); *Longval* v. *Commissioner of Correction*, 404 Mass. 325 (1989); *Kenney* v. *Commissioner of Correction*, 393 Mass. 28 (1984); *Royce* v. *Commissioner of Correction*, 390 Mass. 425 (1983); *Puleio* v. *Commissioner of Correction*, 52 Mass. App. Ct. 302 (2001); *Drayton* v. *Commissioner of Correction*, 52 Mass. App. Ct. 135 (2001); *DeLong* v. *Commissioner of Correction*, 46 Mass. App. Ct. 353 (1999); *Martino* v. *Hogan*, 37 Mass. App. Ct. 710 (1994).

confinement for nondisciplinary reasons under conditions substantially similar to those that existed in 1985, without complying with the applicable regulations. For reasons we shall explain, the prisoners now in or who may be in such confinement, although more in number, are entitled to the protections contained in the regulations promulgated in response to the 1988 order unless and until the applicable regulations are amended or repealed. Amendment or repeal would not be warranted unless the defendants assert meritorious grounds different from those presented to the single justice in 1995. The defendants did not seek any such relief in this action.

I

The plaintiffs are a certified class of "all prisoners who are now confined or may at some point be confined" at Cedar Junction "in any housing unit other than the Departmental Disciplinary Unit" (DDU). Prisoners are housed in the DDU for disciplinary reasons, and we are concerned here only with those prisoners who are segregated unrelated to any reason of discipline.[5] The plaintiffs challenge the severely restrictive conditions of their confinement in the East Wing of Cedar Junction, alleging violations of various regulations and statutes, as well as of the equal protection and due process provisions of the Massachusetts and United States Constitutions. They claim that their nondisciplinary segregation in the so-called East Wing of the prison, tantamount to indefinite solitary confinement in many cases, constitutes confinement comparable to that in the former departmental segregation unit (DSU), and that they are, therefore, entitled to the procedural due process protections applicable to prisoners segregated for nondisciplinary reasons, including those housed in the former DSU. See 103 Code Mass. Regs. §§ 421.00.

The defendants contend that the DSU at Cedar Junction has been abolished and the DSU regulations are therefore no longer of any force or effect. They further argue that the plaintiffs' liberty interests are adequately protected by a six-month "clas-

[5]On November 15, 1995, a judge in the Superior Court certified an open class of plaintiff-prisoners as defined above. The representative class is 536 prisoners as of October 13, 1999.

sification" review every prisoner in every prison under the jurisdiction of the Department of Corrections (department) receives pursuant to 103 Code Mass. Regs. §§ 420.00 (1995).

A judge in the Superior Court, acting on cross motions for summary judgment, allowed the plaintiffs' motion with respect to their due process claim. After thoroughly reviewing the record evidence, the motion judge, in a carefully reasoned memorandum of decision and order, concluded that there were no disputed issues of material fact and that (1) the conditions in the East Wing imposed an "atypical and significant hardship," *Sandin* v. *Conner*, 515 U.S. 472, 484 (1995), on the prisoners confined there; (2) the conditions of confinement in the East Wing are substantially similar to the conditions in the former DSU; and (3) the DSU regulations "must be fully complied with before inmates may be subjected to the restrictive conditions" of the East Wing. The judge later stayed the effectiveness of the third item pending appellate review.

For the reasons set forth below, we reject the defendants' claims and affirm, in substantial part, the allowance of summary judgment because the record does not disclose any disputes of material fact concerning the plaintiffs' due process claim. We do so, however, for reasons different from those relied on by the Superior Court judge. We agree with the judge that the conditions of nondisciplinary segregation about which the plaintiffs complain are substantially similar to the conditions in the former DSU. The regulations that govern placement in such restrictive conditions, 103 Code Mass. Regs. §§ 421.00, have not been repealed, and have the full force of law. *Royce* v. *Commissioner of Correction*, 390 Mass. 425, 427 (1983). Those regulations must therefore be complied with before any prisoner is placed for nondisciplinary reasons in the East Wing under the segregation conditions of confinement operative there. It is accordingly not necessary to reach the constitutional claims or to apply the analysis of *Sandin* v. *Conner, supra,* as the motion judge did.

II

A

The disposition of this case necessitates a thorough recitation

of the background to the litigation, the operation of Cedar Junction, and the conditions of confinement in the East Wing. We summarize the undisputed material facts on the summary judgment record.

The plaintiffs commenced this litigation on June 30, 1995, in the wake of two changes the defendants made in the operation of Cedar Junction during a lockdown of the prison.[6] The first change occurred when the commissioner notified prisoners that those deemed "members" or a "leader" of "security threat groups" (gangs), or those "involved in a security threat group incident" would be "subject to transfer to restrictive housing at MCI-Cedar Junction."[7] The plaintiffs claim that the defendants' application of this gang policy resulted in racially discriminatory long-term segregation placements in violation of the equal protection clause. The plaintiffs' equal protection claim is not before us.[8]

Second, the superintendent notified all prisoners at Cedar Junction that the prison was undergoing "a number of changes both physically and operationally," and that the housing units in the prison would be divided into two "phases" that are now known as the "East Wing" and the "West Wing." The conditions of confinement in the East Wing would be significantly more restrictive than those in the West Wing. The defendants' placement of prisoners in the East Wing gave rise to the

---

[6]The lockdown began on April 3, 1995, in the wake of a disturbance. During the lockdown, prisoners were kept almost continuously in their cells for more than four months: they were allowed out of their cells only for twenty to thirty minutes, twice each week.

[7]On April 19, 1995, the commissioner informed all prisoners housed by the department that "inmates who are members of security threat groups will not be permitted to transfer below medium security" and that a prisoner who is a "leader of any of these groups or any inmate involved in a security threat group incident will be subject to transfer to restrictive housing at MCI-Cedar Junction."

[8]The motion judge found that, although only twenty per cent of the prison population is Hispanic, ninety per cent of all prisoners labeled as gang members are Hispanic. The motion judge held that this disparity combined with a "pervasive atmosphere of racism" at Cedar Junction established a prima facie case of intentional discrimination. Nevertheless, the judge denied the plaintiffs' motion for summary judgment on the equal protection claim and ordered that claim to trial, finding that the defendants' denial of improper racial animus, however "limited," raised disputed issues of material fact as to the implementation of the department's gang policy.

plaintiffs' due process claim, which is now before us on the allowance of the plaintiffs' motion for summary judgment.[9]

## B

Cedar Junction is a maximum security prison, the only one in the Commonwealth. It has long consisted of two physically distinct "wings," both of which house prisoners under conditions of maximum security. The West Wing is comprised of three housing units, each containing seventy-two one-man cells. The East Wing contains eight housing units, each having forty-five one-man cells. Four of the eight East Wing units are called "Plymouth" units and now house prisoners who have been labeled as gang members under the department's gang policy. Thus, in 1995, when this litigation commenced, this maximum security prison housed some 858 of the 10,835 prisoners in the department's custody, by definition the most violent and dangerous, presenting the most difficult and oftentimes hazardous challenges of prison management.[10] Both the East and West Wings also contain an identified "segregation unit," where prisoners are placed for various reasons, such as discipline or pending the

[9]The plaintiffs also sought relief under the Federal and State Constitutions based on the conditions of confinement during the lockdown and for the defendants' "permitting and encouraging the excessive, malicious, and sadistic use of force" against them. The plaintiffs contended that these issues had become moot since the end of the lockdown, but the motion judge in his memorandum and order on the parties' cross motions for summary judgment noted that the complaint did not specify when these practices were alleged to have occurred. The judge found that there were genuine issues of material fact regarding these issues and indicated that they would be resolved in an evidentiary hearing. On October 4, 2000, the plaintiffs voluntarily dismissed their "claim of systemic abuse of force" pursuant to Mass. R. Civ. P. 41 (A) (1) (ii), 365 Mass. 803 (1974), and on October 12, 2000, a judgment entered in the Superior Court dismissing these claims pursuant to Mass. R. Civ. P. 58 (a), as amended, 371 Mass. 908 (1977). That claim is not before us.

[10]The dissent characterizes the West Wing as the "minimum wing" and the East Wing as the "maximum wing" of Cedar Junction. *Post* at 765. The entire institution is, and always has been, a maximum security prison. Lest there be no misunderstanding, we recognize that Cedar Junction, the Commonwealth's only long-time maximum security prison, has always housed the Commonwealth's most dangerous prisoners. The dissent's characterization of the prison environment, however, as "unimaginably dangerous," *post* at 766, which it has been for decades, see, e.g., *Commonwealth* v. *Brown*, 364 Mass. 471, 476 (1973), obscures the issue in this case: whether the defendants can, without any procedural due process protections, select some of these dangerous prison-

outcome of an investigation or a disciplinary hearing.[11] The conditions in the segregation units and in the DDU are not at issue here.[12]

In connection with the 1995 policy changes, the physical configuration of the two wings was not changed. Rather, the defendants implemented what they term operational changes directed at the prisoners themselves. The parties do not dispute that, for prisoners in the East Wing, conditions are now vastly more restrictive than those in the West Wing. Prisoners in the East Wing experience nondisciplinary segregated conditions that are essentially solitary confinement, while housed in the same one-man cells that existed before the department's 1995 operational changes. In the Plymouth units, for example, prisoners are released from their cells for only sixty minutes each day, while those in the other East Wing units receive only ninety minutes of "out of cell" time each day. During their out-of-cell time, East Wing prisoners must, for example, schedule all showers and telephone calls, affording them almost no opportunities for interaction with other prisoners.[13]

In contrast, prisoners housed in the West Wing are not segregated. While all of the prisoners in the West Wing have been determined to require confinement under conditions of maximum security, they are allowed out of their cells for as much as fifteen hours each day, and all day on weekends, and interact with other prisoners throughout those times. East Wing prisoners also eat alone: while they collect their meals outside of their cells, they must return to their cells to eat alone, while

---

ers at Cedar Junction for nondisciplinary segregation in violation of existing regulations.

[11]The East Wing segregation unit and the West Wing segregation unit are located in the same physical spaces at Cedar Junction as the former departmental segregation unit (DSU), described *infra*. Both units are distinct from the departmental disciplinary unit (DDU), to which prisoners may be confined as a disciplinary sanction in conformance with 103 Code Mass. Regs. §§ 430.00 (1993).

[12]The conditions of confinement are the same in each of the two segregation units: they are more severe than the conditions in the West Wing and substantially similar to conditions in the East Wing.

[13]Prisoners housed in the East Wing, including those in the Plymouth units, also receive two hours of library access and two hours of visitation each week.

prisoners in the West Wing eat their meals in a "chow hall." Canteen privileges[14] for prisoners in the East Wing are forty per cent less than canteen privileges for those in the West Wing.

Moreover, segregated confinement in the East Wing may be for long periods. The average continuous period of confinement in the East Wing for the entire plaintiff class is 270 days.[15] In some cases prisoners are segregated in the East Wing for the duration of their sentence. Since the operational changes implemented in 1995, prisoners in the East Wing are locked up in the near-solitary confinement conditions described above effectively indefinitely, for reasons not related to any disciplinary problems and contingent solely on the defendants' subjective evaluation of the prisoners. Thus, except as stated in note 13, *supra,* for either twenty-three hours or twenty-two and one-half hours a day, a prisoner may be housed in solitary confinement solely at the superintendent's discretion.

## C

In Hoffer *vs.* Fair, No. SJ-85-0071 (Mar. 3, 1988), a single justice of this court addressed a complaint brought by prisoners in the DSU at Cedar Junction and Massachusetts Correctional Institution at Norfolk. They sought relief for the procedures by which they were placed and held in nondisciplinary segregation. The single justice ordered that changes be made to the then-existing version of the DSU regulations.

The modified DSU regulations issued in response to that decision are now codified at 103 Code Mass. Regs. §§ 421.00. The DSU regulations apply to all State correctional facilities and are issued pursuant to G. L. c. 124, § 1 (*b*) & (*q*), and G. L. c. 127, § 39. See 103 Code Mass. Regs. §§ 421.02 & 421.04. The purpose of the regulations is "to establish rules whereby an inmate may be confined to a Departmental Segregation Unit *because his continued presence in a general institution population would be detrimental to the program of the institution"*

---

[14]The "canteen" is a prison commissary, from which prisoners can purchase various personal hygiene and food items.

[15]An uncontested representative sampling of the plaintiff class shows that the 200 longest stays in the East Wing averaged 456.1 days; the fifty longest, 739.8 days; the twenty longest, 890.5 days; and the ten longest 981.0 days.

(emphasis added). 103 Code Mass. Regs. § 421.01. The regulations make clear that a prisoner may not be segregated and denied interaction with other prisoners in the institution for nondisciplinary reasons without receiving certain procedural due process protections. See 103 Code Mass. Regs. § 421.07.[16] Rather, a prisoner may be isolated from other prisoners for nondisciplinary reasons to prevent him from injuring others, damaging property, or interrupting the safe operation of the correctional facility only in accordance with the regulations. See 103 Code Mass. Regs. § 421.09. See also *Hoffer* v. *Commissioner of Correction*, 412 Mass. 450, 455 n.6 (1992).

In July, 1995, following the lockdown that precipitated this action, the commissioner "closed" the DSU at Cedar Junction and initiated the administrative process to repeal the regulations governing the placement of prisoners in the DSU. See G. L. c. 30A, § 3. It is noteworthy that the commissioner's affidavit of August 25, 1995, submitted to the single justice in support of the repeal of the DSU regulations, relied on the same grounds asserted here: "a number of large-scale prison disturbances and incidents of unusual violence" during 1992 and 1993 in Massachusetts prisons.

Notwithstanding the commissioner's submission concerning the increased levels of violence at Cedar Junction and elsewhere, on September 26, 1995, a single justice of this court allowed a motion by the plaintiff-prisoners in the Hoffer case, to enjoin the repeal of the DSU regulations. The facts on which the commissioner relied and his arguments before the single justice all but mirror the claims made by the defendants in this case. For example, in 1995, the commissioner maintained before the

---

[16]The regulations were designed to, and do, cabin the power of the prison officials to isolate any prisoner (including those in maximum security conditions) from other prisoners based solely on the subjective evaluation of the prisoner by the prison authorities. Thus, the regulations provide for, among other things, a written referral summary prior to the hearing before the DSU board, prior written notice of the hearing, the right to be represented at the hearing, the right to request that certain witnesses testify and to cross-examine adverse witnesses, and the right to a record of the hearing. See 103 Code Mass. Regs. §§ 421.10 & 421.11. Each prisoner placed in a DSU receives a review of his status every ninety days, 103 Code Mass. Regs. § 421.18, as well as monthly evaluations summarizing his current behavior and recommendations for releasing him from the DSU. 103 Code Mass. Regs. § 421.19.

single justice that "the DSU had outlived its usefulness" because "the climate in the state prison system had become more dangerous, due no doubt in part to severe overcrowding, inmates serving longer sentences, increased racial friction and a growing number of volatile, often gang-affiliated, younger inmates." The same claim is made here. The commissioner argued before the single justice that ordering the defendants to provide certain due process procedures and substantive protections is no longer of "any practical effect" because "there are no DSU prisoners and the Commissioner has no intention of 'designating' any in the future." The same claim is made here. None of these or related claims persuaded the single justice, and the regulations applicable to conditions of nondisciplinary segregation remained in effect. The commissioner did not appeal from the decision of the single justice, nor has the commissioner ever sought a reconsideration of that decision on the basis of any further or different information available to him.

## D

All prisoners entering Cedar Junction are initially housed in the East Wing, including those who have failed in lower security institutions and are, as a result, being returned to Cedar Junction and prisoners who are initially classified to a maximum security institution — for example, those serving life sentences.

The East Wing also houses prisoners transferred from the West Wing. A prisoner is moved from the West Wing to the East Wing solely at the discretion of the superintendent or his designee. According to the deposition testimony of Mark J. Powers, the superintendent's designee at the times relevant to these cases, among the factors used in determining whether to transfer a prisoner from the West Wing to the East Wing are his disciplinary history, over-all adjustment, and "enemy" issues — i.e., concerns that prisoners housed in the same block might not get along well. He testified that the transfer of a prisoner from the West Wing to the East Wing is for reasons "usually surrounding disciplinary reports," although it is undisputed that the transfer to the East Wing is *not* imposed for the commission of a disciplinary offense. A prisoner transferred from the West Wing to the East Wing receives no notice or hearing incident to the transfer.

### E

As the motion judge found, the conditions of confinement in the East Wing are substantially similar to those that existed in the former DSU at Cedar Junction. While in the East Wing, prisoners are housed in isolation for extended periods each day, confined to their single-man cells except for brief specified periods when they may leave for a particular purpose. Prisoners housed in the East Wing do not interact with other prisoners and do not participate in collective activities. Prisoners in the East Wing receive ninety minutes of out-of-cell time seven days a week, while those prisoners in the former DSU received sixty minutes of outdoor recreation five days a week. But prisoners in the East Wing must use their out-of-cell "recreation" time for showers and telephone calls.[17] The result is that prisoners in the East Wing do not receive significantly different out-of-cell time for exercise than those in the former DSU. Prisoners in both the former DSU and in the East Wing eat their meals in their cells and receive the same library and visitation privileges.

As to other restrictive conditions, the record reveals that there are no differences in issued clothing, religious services, educational opportunities, or programming between the former DSU and the East Wing. Prisoners in the former DSU received a greater canteen allowance ($50 a week) than prisoners in the East Wing ($30 a week). Work opportunities for prisoners in the East Wing do not match those in the DSU: there are almost no job opportunities in the East Wing; only three jobs per forty-five-man block exist in the East Wing. There were no such restrictions in the DSU.[18]

### F

Prisoners housed in both the East Wing and the West Wing

---

[17]Prisoners in the former DSU were allowed three showers a week, which apparently did not count against the time that they had out of their cells for recreation; prisoners in the former DSU could place three telephone calls a week from their cells.

[18]Although the defendants claim that prisoners in the former DSU received "no work opportunities," the DSU regulations in fact provide for employment programs. See 103 Code Mass. Regs. § 421.21 (3). To the extent that the defendants failed to provide any employment opportunities whatsoever to prisoners in the former DSU, they appear to have been in violation of the DSU regulations.

are entitled, as are all other prisoners housed by the department
in any facility in the Commonwealth, no matter the level of
security, to receive a review of their status every six months
pursuant to 103 Code Mass. Regs. §§ 420.00.[19] Beyond this
postplacement, six-month classification review, the defendants
do not provide any procedural protections before a prisoner is
housed in the East Wing, or while he remains there. Notwith-
standing the significant differences in restrictive conditions
between the East and West Wings that have now been imple-
mented, the classification reviews are the same for prisoners
housed in both wings: the classification determines only in
which level of security a prisoner is to be housed. If the prisoner
is classified as requiring maximum security confinement, he is
sent to Cedar Junction, space permitting. Beyond that, the deci-
sion to isolate some prisoners from the general population of
those other prisoners also classified to maximum security is the
entirely subjective and discretionary function of the prison
authorities.

Moreover, the plaintiffs submitted an uncontroverted affidavit
from a correctional expert, William H. Dallman, a former
maximum security prison warden in Ohio with twenty-two years
of correctional experience. Dallman, who has never before testi-
fied on behalf of prisoner-plaintiffs, reviewed the records
containing the information on which the defendants relied in
deciding which Cedar Junction prisoners to segregate in the
East Wing. The motion judge found, based on Dallman's unchal-
lenged testimony, that the defendants do not comply with their
own classification procedures. For example, fewer than fifteen
per cent of prisoners are reviewed within one year of their
initial placement in the East Wing.

Dallman's unrebutted analysis of a representative sampling of
486 prisoners also showed that the defendants often failed to
employ or ignored the results of their own system of
classification. The defendants did not compile a classification

---

[19]Title 103 Code Mass. Regs. §§ 420.00 provides generally that a prisoner
receives an initial classification hearing, of which he receives notice and in
which he has the right to participate, the right to a written summary, the right
to appeal to the superintendent, and subsequent classification hearings at least
every six months.

score in 200 out of 486 cases, and in those cases in which scoring had been completed, the defendants ignored the results one-half of the time. Dallman concluded that sixty per cent of randomly selected prisoners and 140 of the 200 prisoners at Cedar Junction whose records he reviewed "were inappropriately placed in segregation" — i.e., were inappropriately confined in the East Wing according to the defendants' own procedures, not his own subjective evaluation. Eighty-five per cent of prisoners in the nonrandom sampling did "not even arguably warrant segregation placement," according to the defendants' own procedures. Nearly one-half the records Dallman reviewed lacked not only justification for segregation, but lacked a basis for confining the prisoner to maximum security.

## III

### A

As noted earlier, the judge considered the plaintiffs' due process claim under *Sandin* v. *Conner*, 515 U.S. 472 (1995), in which the United States Supreme Court recognized that under the Federal Constitution, a prisoner may have a "state-created" liberty interest only in remaining free from "restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.[20] The Court held in that case that a prisoner's confinement in segregation for thirty days because of a disciplinary violation "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Id.* at 486.

In this case, the motion judge concluded that the circumstances of the plaintiff-prisoner class are "entirely different" from those of the inmate in *Sandin* v. *Conner*, *supra*. He pointed out that no prisoner is assigned to the East Wing for disciplinary reasons, that prisoners in the East Wing "spend an indefinite

---

[20]The judge did not distinguish between the plaintiffs' due process claim under the Massachusetts and United States Constitutions, but analyzed the claim through (as he put it) the "lens" of *Sandin* v. *Conner*, 515 U.S. 472, 474 (1995), decided under the due process clause of the Fourteenth Amendment to the United States Constitution.

period of time under essentially the same conditions as those facing disciplinary charges," and concluded that the conditions in the East Wing are "nearly indistinguishable from a disciplinary sanction" and beyond the "range of confinement to be normally expected," even at a maximum security facility. The judge contrasted the indefinite confinement of those in the East Wing, conceivably "through the entire length of their incarceration," as compared to the fixed period of the thirty days at issue in the *Sandin* case.

The judge further held that the State had "create[d]" a liberty interest that triggered due process protections in the regulations applicable to the former DSU because "the conditions in the East Wing and Plymouth units are substantially the same as those which were present in the former DSU." He specifically rejected the defendants' claim that conditions in the East Wing are "less restrictive" than those in the former DSU. The judge also rejected the defendants' claim that the East Wing is the "general population" of Cedar Junction as the sort of "pretextual semantic change aimed at avoiding compliance with regulations" we have criticized in the past. See *Longval* v. *Commissioner of Correction*, 404 Mass. 325, 328-329 (1989).

After concluding that there were no disputed material issues of fact and granting the plaintiffs' motion for summary judgment as to their due process claim, the motion judge allowed the defendants' motion for entry of separate and final judgment under Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974), as to that claim and stayed the aspect of the judgment requiring compliance with the DSU regulations pending appeal. The defendants have appealed, and we granted their application for direct appellate review.[21]

---

[21]The motion judge's decision was issued following the decision of the Appeals Court in *Gilchrist* v. *Commissioner of Correction*, 48 Mass. App. Ct. 60 (1999). There, the plaintiff-prisoner claimed that his internal move from the West Wing to the East Wing violated his due process rights guaranteed by both the State and Federal Constitutions because he was not afforded the process set forth in 103 Code Mass. Regs. §§ 421.00. The Appeals Court vacated the grant of summary judgment to the prisoner holding that the record did not include sufficient evidence to compare the prisoner's living conditions in restrictive confinement with conditions present in the DSU. On remand to the Superior Court, the parties filed an agreed motion to consolidate actions

## B

On appeal, the defendants assert that the due process mandated by 103 Code Mass. Regs. §§ 421.00 before subjecting prisoners to certain restrictive conditions of confinement "rests on outdated notions of liberty and due process rights of prisoners" and that the six-month classification review of all prisoners pursuant to 103 Code Mass. Regs. §§ 420.00 is adequate. They assert that the changes over the past twenty-five years in the operation of Cedar Junction have been for the purpose of effectively managing a maximum security prison that houses a violent prisoner population. According to the superintendent's affidavit, the "successful prosecution of gang affiliated crimes" has caused the prisoner population in the department to change "dramatically": it is younger and more prone to "volatile and frequently gang-affiliated incidents."

With the minor exception described above concerning recreation time, see note 17, *supra*, and accompanying text, the defendants do not dispute the facts concerning the conditions of confinement in the various housing areas of Cedar Junction or in the former DSU. Rather, they contend that the conditions of confinement in the East Wing are not the "functional equivalent" of confinement to the former DSU. To this end, they point out that, although it is undisputed that ninety-three per cent of the prisoners confined in the East Wing are not permitted to work, work for all prisoners is at the discretion of the commissioner, and that, under the DSU regulations, employment is also discretionary. The defendants also note small differences in the manner in which prisoners in the East Wing and the former DSU take their meals, exercise, and move outside of their cells.

The plaintiffs, relying on the defendants' own documenta-

and stay proceedings, which was allowed on February 16, 2000. The undisputed record evidence once absent is now present. The issues of law presented in the *Gilchrist* case have been consolidated into this case in accordance with Mass. R. Civ. P. 42 (a), as amended, 423 Mass. 1402 (1996). See note 3, *supra*.

We are informed that the proceedings in several cases presenting due process claims similar to the one raised here have been stayed pending the outcome of this case.

tion,[22] contend that the East Wing is a de facto DSU, and therefore the regulations governing the placement of prisoners into the DSU and its operation, which are still in effect despite the official closure of the DSU, should apply to prisoners housed in or transferred to the East Wing. They argue that the defendants' position is consistent with a pattern of circumvention of the due process protections that prisoners subjected to restrictive confinement must be afforded under the Massachusetts and Federal Constitutions.

The plaintiffs claim that the conditions of confinement in the East Wing also constitute an "atypical and significant hardship" under *Sandin* v. *Conner*, 515 U.S. 472 (1995), based on the duration and the nature of the restrictive conditions to which they are subjected. In support of their claim, the plaintiffs offered the unrebutted affidavit of Dr. Stuart Grassian, a psychiatrist, that:

> "[P]rolonged solitary confinement is highly toxic to psychological functioning. Inmates go into a kind of stupor, and some even become actively psychotic, agitated and paranoid. Difficulties with concentration and memory, and even overt confusional symptoms, are quite common. Intense anxiety, agitation, and panic attacks occur frequently. Many inmates become overtly paranoid — fearful and preoccupied with the ominous significance of every noise he hears and every shadow that passes his cell. Some inmates become unable to form any coherent string of thoughts; others become progressively, and obsessively, preoccupied with a particular thought or fear, entirely unable to quiet the thought or pay attention to anything else. Many inmates develop severe perceptual disturbances, including perceptual distortions and overt hallucinations."

According to Dr. Grassian, a prisoner confined alone in a cell for extended periods is forced into idleness and restricted in his environment and social stimulation. There are extremely limited, if any, opportunities for educational, occupational, recreational, or social activities, and little opportunity to interact with or

---

[22]The motion judge also relied on documents "produced by the Department for dissemination to the inmates for orientation purposes."

observe the outside world or to maintain family contacts. These hallmarks of solitary confinement, say the plaintiffs, are precisely the conditions that are present in the East Wing at Cedar Junction, and that were present in the former DSU.

## IV

### A

With this background, we address the parties' cross motions for summary judgment. We have reviewed all of the evidentiary materials submitted in conjunction with those motions and agree with the carefully reached conclusion of the Superior Court judge that there is no genuine issue as to any material fact. Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). See *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 370, cert. denied sub nom. *Bailey* v. *Bellotti*, 459 U.S. 970 (1982); *Beatty* v. *NP Corp.*, 31 Mass. App. Ct. 606, 607-608, 613 (1991), and cases cited.

We have considered, for example, in the light most favorable to the defendants, the material submitted regarding the amount of time East Wing prisoners are confined to their cells, out-of-cell time, exercise and recreation, meals (including how prisoners obtain and where they eat their meals), showers, telephone time, library access, employment opportunities, canteen privileges, opportunities to earn good time credits, access to educational and other programming, visits, and the availability of religious services. We have also considered the conditions of confinement in, and the regulations governing, the former DSU, and have compared these conditions with the conditions of confinement in the East Wing. We sometimes noted minor discrepancies, not only between certain statements provided on behalf of the parties, but also among statements submitted by each party. Nevertheless, not one of the differences creates a genuine issue of *material* fact. See *Beatty* v. *NP Corp.*, *supra* at 608 (substantive law will identify which facts are material).

Moreover, as noted above, while the defendants submitted detailed information about the changing racial composition of the prisoner population (increases in African-Americans, Hispanics, and others who are labeled gang members), their assertions regarding an increase in violence in the prison do not

contain any comparable level of detail. In fact, their assertions are mostly generalized statements about changes in conditions within the entire prisoner population housed by the department in all prisons in the Commonwealth, and are noticeably devoid of specific details of changes that have occurred at Cedar Junction itself. They are, in short, conclusory as to the legal issue at the core of the plaintiffs' claim: the nondisciplinary segregation of some, but not all, prisoners classified as requiring maximum security housing. See *Ng Bros. Constr., Inc.* v. *Cranney,* 436 Mass. 638, 648 (2002) ("An adverse party may not manufacture disputes by conclusory factual assertions; such attempts to establish issues of fact are not sufficient to defeat summary judgment"); *Polaroid Corp.* v. *Rollins Envtl. Servs. (NJ), Inc.,* 416 Mass. 684, 696 (1993) (affidavit must set forth specific facts showing genuine issue for trial; bare assertions and conclusions not enough to withstand well-pleaded motion for summary judgment). In the absence of a genuine issue as to any material fact, we consider whether the plaintiffs are entitled to judgment as a matter of law.

B

The prisoners claim that they are being confined in conditions so similar to those of the DSU that they are entitled to the protections of the DSU regulations. See *Longval* v. *Commissioner of Correction,* 404 Mass. 325 (1989). The Appeals Court recently termed the question whether prisoners in the East Wing are being housed in DSU-like conditions without being afforded the procedures mandated by DSU regulations as "particularly troubling." *Gilchrist* v. *Commissioner of Correction,* 48 Mass. App. Ct. 60, 65 (1999). See note 4, *supra.* The isolation of prisoners in segregated confinement, including for nondisciplinary purposes, has been the source of constant appellate litigation.

In *Longval* v. *Commissioner of Correction, supra,* a prisoner challenged on constitutional and other grounds his transfer on two occasions to an administrative segregation unit (ASU) at the Massachusetts Correctional Institute at Concord (Concord) without a hearing and without the authorization of the commissioner. *Id.* at 327. Among other things, the prisoner

argued that his placement in the ASU was the substantial equivalent of his being placed in a DSU because the conditions in the two segregation units were virtually identical. *Id.* at 328. We vacated the grant of summary judgment for the prisoner because there was in that case a dispute of material fact concerning the substantial similarity between the ASU and the DSU, and whether the ASU at Concord was "in practical effect" a DSU. *Id.* at 330. Although we remanded the case to the trial court to resolve these disputed factual issues, we cautioned that "the department and the commissioner may not sidestep statutory and regulatory provisions stating the rights of an inmate as to his placement in a DSU by assigning as a pretext another name to such a unit." *Id.* at 328-329. See *Royce* v. *Commissioner of Correction,* 390 Mass. 425, 429-430 (1983) (prison administrators "may not abuse their discretion . . . by using awaiting action status as a means to accomplish an unlimited punishment immune to the procedures set forth in the rules and regulations").

The Appeals Court has reaffirmed that the commissioner may not place prisoners in segregation for nondisciplinary reasons with conditions as severe as those of a DSU without the procedural protections afforded by 103 Code Mass. Regs. §§ 421.00. See, e.g., *Martino* v. *Hogan,* 37 Mass. App. Ct. 710, 721 (1994) ("where the conditions in a segregation unit, however named by the correction officials, were as severe as those at the DSU, the unit should be dealt with, at least for such purposes as requirements of hearings and so forth, as a DSU"). See also *Gilchrist* v. *Commissioner of Correction,* 48 Mass. App. Ct. 60, 64 (1999), quoting *Longval* v. *Commissioner of Correction, supra* at 328 (whether plaintiff "was entitled to the procedural protections set out in the regulations governing DSUs depended upon whether his 'placement in [restrictive confinement] . . . was shown to be the substantial equivalent of his being placed in a . . . DSU' "). In several such cases, disputes as to material facts precluded the entry of summary judgment. See, e.g., *Gilchrist* v. *Commissioner of Correction, supra* at 64-66; *DeLong* v. *Commissioner of Correction,* 46 Mass. App. Ct. 353, 357 (1999) (record lacked "factual wherewithal" for comparing conditions suffered by plaintiff "with existing condi-

tions of the general population, of other forms of segregation, and of the range of confinement expected for inmates serving the same sentence as the plaintiff").

In this case the record is fully developed, and there are no disputes as to material facts. The motion judge had available to him the decision of the Appeals Court in *Gilchrist* v. *Commissioner of Correction, supra*, and was careful to specify with particularity his reasons for determining that there were no disputed issues of material fact and that "[t]he evidence in the record demonstrates that the conditions of confinement in the East Wing and Plymouth units are substantially the same as those found in the former DSU . . . ." On our own review of the record we reach the same conclusion.

In determining whether the conditions in the East Wing are as severe as those in the DSU such that due process protections are warranted, we pay particular attention to those deprivations that were the essence of confinement for nondisciplinary reasons in the DSU: the segregation of a prisoner in near solitary confinement, for no specified period.[23] As discussed in detail above, the degree of segregated confinement experienced by prisoners in the East Wing in every material respect is every bit as harsh — both in extent and duration — as confinement in the DSU. Despite the defendants' claim that there are differences in the conditions of confinement between the East Wing and in the former DSU, such differences are insignificant, while the essence of confinement is the same in each unit.[24] Prisoners are placed in segregation for an indefinite period of time, not for

---

[23]As the motion judge correctly noted, the United States Supreme Court has focused its inquiry on the degree of restriction — e.g., the amount of time a prisoner is confined to his cell — and the length of time the prisoner is subjected to the more restrictive conditions as critical factors in determining whether the prisoner is entitled to due process protections. *Sandin* v. *Conner*, 515 U.S. 472, 486 (1995).

[24]The dissent concedes that the conditions of confinement in the East Wing and in the former DSU are "similar in some respects," with a prisoner's isolation as the "point of greatest similarity." *Post* at 767. It is, of course, the isolation of prisoners that gave rise to the constitutional necessity for the DSU regulations in the first place. As to differences between the DSU and the East Wing, the dissent notes only that prisoners in the former DSU exercised outdoors, alone, in a 350 square foot exercise cage, while prisoners in the East Wing exercise outdoors fifteen at a time in a 5,000 square foot exercise yard. *Post* at 768. Such differences are insignificant and immaterial where the explicit

any specific disciplinary reason (for which they would be sent to the DDU and afforded the procedural protections in 103 Code Mass. Regs. §§ 430.00), but rather because of the prison authorities' subjective evaluation of their behavior in general. Differences in the specific amount of time a prisoner spends out of his one-man cell for particular purposes (showers or telephone calls), or the manner in which he receives his food or goes to the library, are insignificant where the explicit nature of the housing is segregation from the general prison population and constitutes, in effect, solitary confinement.

The indefinite term of a prisoner's segregation in the East Wing is one other, critical similarity between the East Wing and the former DSU. As we noted in *Hoffer* v. *Commissioner of Correction*, 412 Mass. 450, 456 (1992), a prison resident who is not provided with a conditional release date from segregated confinement and with conditions by which to guide his behavior "is possibly subjected to arbitrary treatment."[25] Moreover, "[w]ithout the benefit of knowing what is expected of him while segregated, the resident is denied the opportunity to work toward improving his situation." *Id.* Because the prisoner does not know when or how his confinement in segregation will end, he is denied "a meaningful incentive to modify his behavior and conform to prison regulations." *Id.*

The thrust of the defendants' response to the overwhelming factual record that conditions in the East Wing are in substantial measure identical to those in the DSU is to argue that prison conditions have changed since the order of the single justice in 1988 requiring the process set out in the DSU regulations. As we noted earlier, it is the defendants' actions at Cedar Junction that are at issue in this case, and there is scant record support

---

nature of East Wing confinement is nondisciplinary segregation from the general prison population, and where the time during which prisoners can participate in collective activities is minimal.

[25]It is undisputed that prisoners housed in the East Wing are neither given a release date from segregated confinement, nor are they told what behavior will qualify them for placement in the West Wing, or what behavioral modifications will result in their transfer out of the East Wing. There is no meaningful review of a prisoner's conduct while in the East Wing. Indeed, as described by Dallman, and not contested by the defendants, many prisoners housed in the East Wing do not receive even the six-month review mandated by 103 Code Mass. Regs. §§ 420.00.

for any significant changes in that institution. As we explained earlier, in 1995 the commissioner attempted to repeal the DSU regulations, but his attempt to do so was enjoined by a single justice of this court.[26] The commissioner did not appeal from the order of the single justice, nor does the record reflect that he has made any subsequent attempt to modify or repeal the regulations. The defendants would ignore that the regulations have the full force of law. See *Kenney* v. *Commissioner of Correction*, 393 Mass. 28, 34 (1984); *Royce* v. *Commissioner of Correction*, 390 Mass. 425, 427 (1983). See also *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 768-769 (1980), quoting *DaLomba's Case*, 352 Mass. 598, 603 (1967) (rules promulgated pursuant to legislative grant of power "generally have the force of law").[27]

The dissent states that there is "overwhelming support in the record for the conclusion that the reconfiguration [of Cedar Junction] was necessary to secure the safety of prisoners and staff alike, in the context of an unprecedented influx of violent gang members." *Post* at 765. That generalized statement glosses over the real deficiencies in the defendants' factual submissions. What is challenged in this lawsuit is the actions of the defendants concerning some, but not all, prisoners who are classified as requiring maximum security and are thus housed in Cedar Junction. Absent from the record is evidence of any changes in the numbers of prisoners convicted of gang-related crimes who are incarcerated at Cedar Junction rather than other prisons, evidence of changes in the number of prisoners housed at Cedar Junction who have some gang affiliation, or evidence of overcrowding at this maximum security prison as opposed to other prisons, to name but a few examples. The evidence of the defendants on these points is "overwhelming" only in that

[26]The dissent recognizes, *post* at 768, that the "the merits of that ruling are not now before us": that final order, never appealed, has the full force of law. Neither this court, nor any other, has suggested that the decision reached by the single justice is incorrect in any respect.

[27]The defendants make a fleeting suggestion that the DSU regulations are "no longer of any force and [e]ffect" because the commissioner exercised his authority to "repeal" them following the closure of the DSU. The claim is without merit for, as noted, a single justice of this court enjoined the repeal of the DSU regulations.

generalized conclusions, unsupported by facts as to conditions at Cedar Junction, are oft repeated in the affidavits and deposition testimony of the defendants.

The dissent also cites to evidence in the summary judgment record concerning the increase in over-all size of the Massachusetts prisoner population, at the same time that the number of correction officers decreased. *Post* at 774-775. There is little if anything in the record linking these global changes to Cedar Junction. There is no claim of overcrowding at Cedar Junction itself. There is nothing in the record concerning a change in the ratio of guards to prisoners at Cedar Junction. While there is record support for the number of incidents during in 1995 in which guards used force against the prisoners at Cedar Junction, the record contains no evidence of comparable numbers in other years. The dissent's description of "an unprecedented influx of violent gang members," *post* at 765, is simply not supported as to the prison at issue in this litigation.[28]

Even if, by the summer of 1995 when the defendants embarked on the operational changes at issue here, "the climate in the state prison system had become more dangerous," and even if the defendants were confronted by "severe overcrowding, inmates serving longer sentences, increased racial friction and a growing number of volatile, often gang-affiliated younger inmates," as one of the defense affiants stated, the defendants' response to the problem — the placement of some prisoners classified to Cedar Junction into segregated confinement in near solitary conditions — violates a regulatory framework that mandates that prisoners segregated for nondisciplinary reasons are entitled to the procedural protections of due process. That regulatory framework was specifically promulgated to deal with, in part, those violent prisoners who are assigned to Cedar Junction.

The defendants' suggestion that the procedural protections contained in 103 Code Mass. Regs. §§ 421.00 are applicable

---

[28]There is no requirement that the moving party dispute facts that are not material to the claim for which summary judgment is sought. While the commissioner is "not required to set forth his entire defense to the plaintiffs' claims to defeat a motion for summary judgment," as the dissent notes, *post* at 774 n.15, the defendants are, of course, required to produce evidence sufficient to create a genuine dispute of material fact. They have not done so.

only to those housing placements that the commissioner may choose to label as "departmental segregation units" has been rejected, more than once. See, e.g., *Longval* v. *Commissioner of Correction*, 404 Mass. 325 (1989); *Martino* v. *Hogan*, 37 Mass. App. Ct. 710, 721 (1994). The regulations are applicable to all placements of prisoners in segregated confinement for nondisciplinary reasons for an indefinite period of time; in other words, those prisoners whom prison authorities determine will interfere with the management of the prison unless they are segregated from the general prison population. The procedures are tailored to address precisely such housing placements: the inquiry focuses not on whether a prisoner has committed a specific infraction for which discipline may be warranted for a particular period, but on whether his conduct generally warrants long-term segregation.[29] Those procedural protections "reflect the understanding that commitment of a resident to a segregation unit results in a significant reduction of that resident's liberties." *Hoffer* v. *Commissioner of Correction*, 412 Mass. 450, 455 (1992).

We also reject the defendants' claim, as did the motion judge, that the prisoners in the East Wing comprise the "general population" of Cedar Junction. We agree with the motion judge that such labeling is nothing more than a "pretextual semantic change."[30] Nor is there merit to the dissent's position that to conclude that the East Wing is substantially similar to the DSU

---

[29]The dissent concedes that, "[i]n 1985, prisoners who posed a danger to other prisoners, prison property, or the safe operation of the prison while living within the general population could be removed from that population and placed in a DSU where conditions were significantly more restrictive." *Post* at 768. There is nothing to suggest that these dangerous prisoners were any less so in 1985, and the single justice concluded that segregation of even dangerous prisoners could only occur if certain due process protections were in place, such that the subjective views of prison authorities was conditioned on appropriate standards subject to review. The dissent further concedes that prisoners housed in the East Wing are kept there at "the discretion of the superintendent." *Post* at 767. It is just this "discretion" that the due process protections in the regulations are designed to ensure is properly exercised.

[30]Contrary to the dissent's claim, the motivations of the defendants in segregating some prisoners in the East Wing is irrelevant to the plaintiffs' due process claim. Nothing in *Longval* v. *Commissioner of Correction*, 404 Mass. 325 (1989), suggests, let alone requires, that the motivation of the defendants in creating a system of housing is an element of a plaintiff-prisoner's due

*requires* a finding that there is a single general population in Cedar Junction and that the general population consists *only* of the prisoners housed in the West Wing. *Post* at 769-771. Title 103 Code Mass. Regs. § 423.06, provides that the East Wing *and* the West Wing are the "general population" of Cedar Junction: neither is a special management unit, health service unit, DSU, DDU, or protective custody unit.[31] The regulatory scheme contained in 103 Code Mass. Regs. §§ 421.00 precludes the defendants from subjecting some prisoners confined to this maximum security institution to segregation for nondisciplinary reasons without due process. In short, the defendants may not circumvent the applicable regulations by labeling assignment to nonsegregated conditions in the West Wing "an incentive and reward for the positive behavior of prisoners," in the words of the dissent. *Post* at 767. Nothing in the regulations precludes prison authorities from rewarding those prisoners actually convicted of gang-related crimes if they participate in the

---

process claim. The review is an objective one, as the motion judge correctly understood. Still less is pretext, as used in discrimination cases, of any relevance. *Post* at 772 n.11. Rather, as Justice Kaplan has noted, *Longval* v. *Commissioner of Correction, supra,* "suggested that where the conditions in a segregation unit, however named by the correction officials, were as severe as those at the D.S.U., the unit should be dealt with, at least for such purposes as requirements of hearings and so forth, as a D.S.U." *Martino* v. *Hogan,* 37 Mass. App. Ct. 710, 721 (1994).

[31]We note that the superintendent describes the organization of Cedar Junction as containing "a number of different general population housing units with attendant, but not significantly different, levels of privileges." Assistant Deputy Commissioner Ronald Duval describes *both* the East Wing and the West Wing as the "general population" at Cedar Junction. Duval's affidavit of July 10, 1995, further describes Cedar Junction as housing "an inmate population of 858 of which 734 inmates are housed in general population." The dissent ignores the regulatory definition of "general population," stating that the "general population" is where the "majority of prisoners normally live." *Post* at 770. What constitutes the "general population" is not determined by the number of prisoners confined to a particular area, nor is it dependent on a particular physical location of prisoners, as the dissent assumes. *Post* at 770. The applicable regulations, 103 Code Mass. Regs. §§ 421.00, prohibit the segregated confinement of some prisoners for nondisciplinary reasons without due process. Whether such prisoners are housed in a unit labeled a disciplinary segregation unit or in only one wing at Cedar Junction is not relevant to the applicability of the regulations.

department's Security Threat Group Program.[32] Nothing precludes the department from segregating from the general population those prisoners who it is determined, consistent with due process, must be segregated to prevent injury to others or the interruption of the safe operation of the prison. Nothing prevents the defendants from undertaking "major operational change[s]" at Cedar Junction. *Post* at 766. But all such changes must conform to regulatory and constitutional requirements. It is the unreviewable, subjective selection of only some maximum security prisoners to be housed in severe and segregated conditions that gives rise to the constitutional problem. That problem is not "resolved" by dramatically increasing the number of prisoners who are treated in this manner.[33] The plaintiffs have established that the basis of their assignment to isolated conditions is seriously flawed, their tenure in segregation indefinite and dependent only on the defendants' subjective discretion, not subject to review. The existing regulatory scheme does not permit the defendants to act in that manner.

## V

We recognize the obligation of the commissioner and other officials of our prison system to maintain security in all institutions under their jurisdiction, and to ensure the safety of all who work there, as well as the prisoners themselves. Prison overcrowding, longer prison sentences, and the prosecution of gang-related crimes have made prison management throughout our prison system more difficult. But the solution cannot be found in violation of a constitutionally required regulatory scheme, one that continues to have the force of law. The commissioner has not challenged the testimony of the prisoners' expert that a substantial number of the certified class are inap-

---

[32]The Spectrum program, described by the dissent, is a compelling example that the defendants can, and do, address issues of prison violence and gang membership without violating regulations governing the treatment of prisoners. See *post* at 767 n.4.

[33]That "two-thirds" or a "majority," *post* at 764, of prisoners at Cedar Junction are housed in the East Wing, as the dissent notes, is not material: the number of prisoners subjected to near-solitary conditions for nondisciplinary reasons does not vitiate the legal obligation of the defendants to comply with extant regulations that govern the placement of prisoners in such conditions.

propriately segregated from other prisoners and that the records of others lack any basis for confinement in a maximum security institution in the first place.[34] The purpose of the DSU regulations was to "establish rules" whereby an inmate may be placed in segregation "because his continued presence in a general institution population would be detrimental to the program of the institution," such that improper subjective evaluation of individual prisoners would be subject to review. 103 Code Mass. Regs. § 421.01. The regulations must be complied with. See *Longval* v. *Commissioner of Correction, supra* at 328-329.

We affirm the decision of the motion judge that the procedural protections contained in 103 Code Mass. Regs. §§ 421.00 must be afforded to all prisoners before they are housed in DSU-like conditions operating today in the East Wing, subject only to the exception next described: all prisoners entering Cedar Junction, including some for whom there is no expectation that they will remain at that facility, apparently are first placed in the East Wing. Some are then quickly classified to other institutions, or are moved into the West Wing, perhaps in a matter of days.[35] For those prisoners whose stay in the East Wing is intended to be, and is, brief, the procedural protections are not required because their placement in the East Wing implicates a lesser deprivation of individual liberty than it does for the prisoners whose confinement to the East Wing is lengthy or indefinite.

Accordingly, we affirm the grant of summary judgment on the plaintiffs' due process claim to the extent that it applies to those prisoners who are (1) transferred to the East Wing from the West Wing; (2) labeled as gang members and placed in the Plymouth or other units of the East Wing; (3) returned to Cedar Junction; or (4) remain in the East Wing for longer than a brief period for "booking" or similar reasons. For these prisoners, the procedural protections set forth in 103 Code Mass. Regs.

[34]The dissent takes issue with the analysis of the plaintiffs' expert, William H. Dallman, as not relevant. See *post* at 774 n.16. To the contrary, it lends further support to the plaintiffs' argument that their segregated confinement occurs in violation of the very harm the DSU regulations were promulgated to prevent.

[35]A deputy superintendent of Cedar Junction testified that the "majority of inmates in the Commonwealth who are committed remain at [Cedar Junction] generally overnight. They are booked in and pictures [are] taken and then they are moved out to Concord the following day."

§§ 421.00 are required. We vacate so much of the order as may apply to prisoners sent to the East Wing of Cedar Junction initially on confinement in the expectation that their stay there will be brief.[36]

The policy of the department to place certain prisoners at Cedar Junction in segregated conditions for nondisciplinary reasons has been in effect since at least 1995, and there are now several hundred prisoners housed in the East Wing in such conditions. The judge in the Superior Court stayed his injunction against such segregated confinement pending this appeal. To ensure that the defendants may effectuate the injunction in an orderly and safe manner, the case is remanded to the Superior Court judge for further proceedings consistent with this opinion, and to determine the timing and manner of implementing the provisions of 103 Code Mass. Regs. §§ 421.00 at Cedar Junction.

*So ordered.*


CORDY, J. (dissenting, with whom Cowin and Sosman, JJ., join). The court holds that the procedural protections governing the removal of an inmate from the general prison population and his confinement to a department segregation unit (DSU) apply to decisions regarding the housing of two-thirds of all of the prisoners in the State's only maximum security prison, Massachusetts Correctional Institution, at Cedar Junction (Cedar Junction). These protections are contained in the department's regulations at 103 Code Mass. Regs. §§ 421.00 (1993) (DSU regulations). Their application to the housing of the majority of prisoners at Cedar Junction is contrary to their purpose and the judicial and regulatory history leading to their enactment. Therefore, I dissent.

This litigation arises from the 1995 operational reconfigura-

---

[36]The record does not reveal the average number of days that prisoners who are being "processed through" the East Wing remain there before they are transferred to other institutions or the West Wing. When we say "brief," we have in mind days, not weeks. The defendants may "not postpone indefinitely the happening of the events that will terminate" the undefined status of such prisoners. *Royce* v. *Commissioner of Correction*, 390 Mass. 425, 430 (1983).

tion of Cedar Junction into two separately functioning and controlled wings, a maximum wing (East) and a minimum wing (West).[1] There is overwhelming support in the record for the conclusion that the reconfiguration was necessary to secure the safety of prisoners and staff alike, in the context of an unprecedented influx of violent gang members.

The plaintiff prisoners challenge the decision-making process leading to their assignment to housing in the maximum wing on due process grounds. In my view, decisions regarding the assignment of prisoners to housing within the general population of a prison are beyond the reach of the DSU regulations and not properly subject to a due process challenge in these cases. To the extent that the regimented life of a prisoner housed in the maximum wing of the prison may be too harsh, it can be challenged on grounds of cruel and unusual punishment. To the extent that a decision by the superintendent to house a prisoner in the maximum wing is arbitrary or based on improper considerations, it may be subject to an equal protection challenge. But in no event, on the record before the trial judge and this court, is there a basis in law or fact to enter summary judgment for the plaintiffs on their due process claim.

1. *Background.* Cedar Junction is the State's only maximum security prison. It houses the most dangerous and violent prisoners within the Massachusetts prison population. For security purposes, prisoners who have engaged in serious acts of violence or other dangerous behavior while incarcerated at other Massachusetts prisons are transferred there.[2] Because a paramount concern and responsibility of the Department of Correction (department) is ensuring the safety of the institution's

---

[1] The Massachusetts Correctional Institution, at Cedar Junction, is a maximum security prison. It consists of two wings, both of which house prisoners under maximum security conditions. The conditions of confinement in each wing vary, however. I refer to the West Wing as the "minimum" wing and the East Wing as the "maximum" wing as a way of describing the degree of confinement in each wing within the context of a maximum security prison.

[2] The Department of Correction's classification regulation, 103 Code Mass. Regs. § 420.09 (4)(a) (1995), requires a classification hearing whenever an inmate is transferred to a higher security correctional facility because of disciplinary or security issues. It is not contended in the cases before us that inmates transferred to Cedar Junction for disciplinary or other "security issues" have not received classification hearings with respect to those transfers.

staff and inmates in an unimaginably dangerous environment, the department must adjust the operation of the institution to meet the challenges of the inmates sent into its custody. It is uncontested that these challenges became significantly greater in the 1990's, with a substantial increase in the number of criminals entering the prison system with lengthy sentences to serve, and with the influx of large numbers of young and violent gang members, many of whom are now serving their sentences at Cedar Junction. As found by the Superior Court judge who considered and denied plaintiffs' motion for injunctive relief in this case, "the recent infusion into the state prison of substantial numbers of members of warring gangs has presented the corrections system with unprecedented problems in controlling the institution and making it reasonably safe for staff and inmates."

In the 1980's, both the minimum and maximum wings at Cedar Junction were operated in a so-called "open campus" manner. However, in the early 1990's, violent and organized attacks on correction officers and other inmates, combined with intelligence gathered from the prison population suggesting the planning of further, organized, large-scale acts of violence within the prison, necessitated a significant reassessment and reorganization of the institution. The institution needed to control the inmates, not vice versa.

In 1993, in the aftermath of some particularly violent incidents, Cedar Junction instituted a three-phase program, with fewer privileges and more restrictions in the first phase, and more privileges and fewer restrictions in phases II and III. The violence continued, and by 1995, the program had been deemed unsuccessful. In June, 1995, the superintendent announced a major operational change to the institution. The three-phase system was replaced by a two-phase system devised to take full advantage of the physical separation and the design differences between the two prison wings.[3] Phase I was to be located in the maximum wing, and phase II, in the minimum wing. Phase I

---

[3]Cedar Junction was designed and built with two separate wings. The maximum wing has eight cell blocks of forty-five inmates, organized on three tiers of fifteen cells each, with "grill" doors (bars), all facing an observation wall of one-way glass so that they can be closely monitored. It also contains a cell block for new prisoners. The minimum wing has three cell blocks of seventy-two inmates, organized on one floor (no tiers), with solid doors for

was characterized by higher restrictions and fewer privileges, and was to be operated under high security protocols; phase II was characterized by fewer restrictions and greater privileges, and was to operate as an incentive and reward for positive behaviors by other Cedar Junction prisoners. The announced purpose of this change was the creation of a safer environment.

Following the implementation of the two-phase living system, inmates entering Cedar Junction for initial evaluation, inmates from other institutions reclassified to higher security and sent to Cedar Junction, and inmates identified as members of "security threat groups" (e.g., gang members) were housed in the maximum wing. Other prisoners were housed in the minimum wing, until and unless their conduct warranted (in the discretion of the superintendent) their relocation. Prisoners could be transferred from the maximum wing to the minimum wing on the basis of behavior and cell availability. Prisoners could also be transferred to other, lower security institutions on successful completion of a two-phase therapeutic program designed to break the cycle of gang involvement both in prison and after release.[4]

Although they are geographically within the same prison complex, the maximum and minimum wings are physically separate from each other and operate completely differently with regard to meals, recreational opportunities, and privileges. The restrictions on inmate movement in the maximum wing are substantially greater than those on inmates housed in the minimum wing and are similar in some respects to restrictions in the former DSU. The point of greatest similarity is the amount of time an inmate spends out of his cell. In the DSU, an inmate was permitted out of his cell one hour a day, five days a week. In the maximum wing, inmates are permitted out of their cells between one and one and one-half hours a day, seven days a

more privacy. Each wing was also built with its own department segregation unit (DSU). Prior to 1995, there were thirty DSU cells in the maximum wing and sixty DSU cells in the minimum wing. Aside from the DSU cells, there are 418 cells in the maximum wing and 216 cells in the minimum wing.

[4]As of May, 1998, there were 171 gang or security threat group members who successfully completed the entire program. One hundred fifty-six of these prisoners were reclassified and transferred to lower security prisons.

week.[5] Even at this point of similarity, there are significant differences. For example, if inmates chose to spend their out-of-cell time exercising, DSU inmates were released to an exercise cage (ten feet by thirty-five feet by ten feet) where they spent their time alone, while maximum wing inmates are released in groups of up to fifteen to a recreation yard measuring fifty feet by one hundred feet.

2. *The DSU regulations.* The regulations contained in 103 Code Mass. Regs. §§ 421.00, were enacted as the result of a series of orders of a single justice of this court in the case of Hoffer *vs.* Fair, No. SJ-85-0071 (Mar. 3, 1988). That case, commenced in 1985, dealt with the relationship between conditions under which the general prison population of Cedar Junction then functioned and the operation of the DSU as it then existed. It is reasonable to conclude from the records of both cases that the entire population of Cedar Junction had fewer restrictions and more privileges in 1985 than those currently afforded to any prisoner now housed there.

In 1985, prisoners who posed a danger to other prisoners, prison property, or the safe operation of the prison while living within the general population could be removed from that population and placed in a DSU where conditions were significantly more restrictive. The single justice concluded that the removal of such a prisoner should be subject to specific due process protections (which he found were required by the Massachusetts Constitution) principally because "[t]he nature and extent of the reduction of liberty from that experienced in the general population is . . . significant." He consequently directed that the regulations now at issue be promulgated to govern the movement of a prisoner from the general population to a DSU. The department did not appeal from the ruling of the single justice, and the merits of that ruling are not now before us.

By 1995, the use of the DSU as a tool to control violence within Cedar Junction's highly volatile population by isolating a few troublemakers (it housed only two inmates) from the general

---

[5]Although the Superior Court judge appears to have assumed that inmates in the maximum wing are released from their cells only five days a week, that assumption is contrary to the evidence in the record.

population was patently ineffective, and its use was eliminated.[6] Efforts by the department to eliminate the corresponding DSU regulations, however, were subsequently enjoined by a single justice of this court, and they remain in effect today.[7]

3. *Summary judgment.* The motion judge ruled on the parties' cross motions for summary judgment that the DSU regulations applied to the confinement of a prisoner in the maximum wing. He based this ruling on three necessary subsidiary findings: (1) the conditions of confinement in the maximum wing "are nearly identical to those which existed in the former DSU"; (2) the "general population" of Cedar Junction is not the population housed in the maximum wing; and (3) the commissioner's reorganization and labeling of the maximum wing as the "general population" was "pretextual," "aimed at avoiding compliance with [DSU] regulations." See *Longval* v. *Commissioner of Correction,* 404 Mass. 325, 328-329 (1989) ("the department and the commissioner may not sidestep statutory and regulatory provisions stating the rights of an inmate as to his placement in a D.S.U. by assigning as a pretext another name to such a unit").

In its opinion, the court affirms this portion of the judge's summary judgment ruling. Because the last two of the judge's three subsidiary findings are not supported by undisputed facts in the record, his ruling on summary judgment should be reversed.[8]

The second of the judge's subsidiary findings is that the population in the maximum wing is not the "general population" of Cedar Junction. This finding is necessary to his ultimate ruling because the DSU regulations apply only to the removal of prisoners from the "general population" and their placement in conditions of confinement involving a significant reduction of liberty from that afforded the "general population." If the

---

[6]The former DSU cells are now used either to hold inmates awaiting disciplinary action or, in some instances, to hold inmates who are serving disciplinary sanctions as an overflow from the prison department disciplinary unit (DDU).

[7]This order was also not appealed.

[8]For these purposes, I assume that the judge's finding that conditions of confinement in the former DSU and the maximum wing are nearly identical is adequately supported in the record.

population in the maximum wing is the "general population," there is no removal and no significant reduction in liberty when a prisoner is assigned to that wing for housing. The judge bases his conclusion that the maximum wing is not the "general population" exclusively on his first subsidiary finding that the conditions of confinement in the maximum wing are nearly identical to the conditions of confinement in the former DSU. Therefore, he concludes that "the position taken by the Department [that the maximum wing is the general population] is not persuasive."

The judge's conclusion does not follow logically from his first subsidiary finding. His reasoning is both circular and inconsistent with the appropriate legal standard to be applied. The "general population" of a prison is not defined by the severity of the conditions of confinement. There is little question that the department could have uniformly imposed the restrictions now present in the maximum wing on the entire prison without violating the single justice's judgment in Hoffer, and without having to comply with the DSU regulations. The general population is simply where the majority of prisoners normally lives, absent confinement in a specialized unit within the prison.[9] Although the judge rejects the department's contention that the maximum wing is the general population of Cedar Junction, he makes no explicit finding of where that "general population" resides. We assume that it must exist somewhere. If we leave the location of the "general population" undefined, it is impossible to conclude whether the DSU regulations apply to a transfer from that population to another population.

If the entire prison, both the maximum and minimum wings, constitute the "general population" as the court asserts, the DSU regulations are facially inapplicable to a prisoner's place-

---

[9]The "general population" of a Massachusetts correctional facility is defined as "any housing area other than a special management unit, health service unit, departmental segregation unit, departmental disciplinary unit, or the departmental protective custody unit." 103 Code Mass. Regs. § 423.06 (1995). This definition expressly does not apply to inmates housed in a "departmental segregation unit [or] a departmental disciplinary unit."

ment in or transfer to either wing.[10] Similarly, if the maximum wing constitutes the general population, the DSU regulations are likewise inapplicable to a prisoner's placement in or transfer to that wing. If the minimum wing constitutes the "general population," the DSU regulations presumably would apply to a prisoner's placement in or transfer to the maximum wing. But to conclude that the "general population" is the population residing in the minimum wing one would have to view the present operation of Cedar Junction through the "Looking Glass."

Four hundred and eighteen of the 634 housing cells in Cedar Junction are located in the maximum wing and are subject to high security protocols. The much smaller minimum wing is operated differently to encourage and reward positive behavior by inmates. By creating different and less restrictive conditions within a discrete area of the general population of the prison as an incentive and reward for the positive behavior of prisoners, the department has not converted the prison into one in which those more beneficent conditions constitute the general conditions of its prison population. Nor have the department's actions in creating a different living environment for a minority of prisoners converted the living area of two-thirds of the prison into something other than the "general population" of the prison. In sum, there is no factual support, and certainly no support based on uncontested facts, for the judge's finding that the maximum wing is not part of the general population of Cedar Junction.

The judge's third subsidiary finding, that the reorganization of the maximum wing of the prison and its denomination as the "general population" of Cedar Junction was a pretext to avoid compliance with the DSU regulations, is similarly flawed. A "pretext" is an "[o]stensible reason or motive assigned or assumed as a color or cover for the real reason or motive; false appearance, pretense." Black's Law Dictionary 1187 (6th ed. 1990). To succeed on their motion for summary judgment, the

---

[10]The DSU regulations define a DSU as an area designated "for any inmate segregated" from the "general population." 103 Code Mass. Regs. §§ 421.06, 421.09 (1993).

plaintiffs had the burden of demonstrating that there was no genuine issue as to any material fact and that they were therefore entitled to a judgment as a matter of law. Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). Whether the commissioner's stated reasons for creating the current configuration of Cedar Junction were a pretext is a classic example of a disputed issue of material fact.[11]

Consistent with the requirements of Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974), the commissioner filed affidavits from the current[12] and former[13] commissioners of the department, and

---

[11]We are called on to deal with the concept of "pretext" in many other contexts. For example, in employment discrimination cases where a plaintiff must prove that an employer's stated justification for an adverse action is not genuine, but rather is a pretext, we examine whether the employer's proffered reason "has no reasonable support in the evidence" or is "wholly disbeliev[-able]." See, e.g., *Wheelock College* v. *Massachusetts Comm'n Against Discrimination*, 371 Mass. 130, 138 (1976). In jury cases, where parties may not strike jurors based on factors such as race or gender, we examine whether the proffered explanation for striking a juror is "bona fide or a pretext" by considering "whether the challenge has a substantive basis or is impermissibly linked to race[, gender, or another factor]." See, e.g., *Commonwealth* v. *Calderon*, 431 Mass. 21, 26 (2000). In search and seizure cases, we look to see whether the reasons a police officer gives for conducting a search was a pretext concealing an investigatory motive. See, e.g., *Commonwealth* v. *Matchett*, 386 Mass. 492, 509-510 (1982).

[12]Commissioner Michael Maloney attested in a 1998 affidavit that the department experienced "an unprecedented growth in the Massachusetts prisons of the number of volatile and frequently gang-affiliated incidents with younger inmates." He explained that organized groups of inmates posed a significant threat to safety in the prison environment, and required the department to find a way effectively to manage, through incentives or otherwise, a violent prisoner population.

[13]Former Commissioner Larry E. DuBois attested in a 1995 affidavit that, as of June, 1995: "the climate in the state prison system had become more dangerous, due no doubt in part to severe overcrowding, inmates serving longer sentences, increased racial friction and a growing number of volatile, often gang-affiliated, younger inmates." He also states that: "In the past few years in Massachusetts, as law enforcement has secured the conviction of many gang leaders and members, there has been a corresponding unprecedented increase in gang membership in the Department's prisons." In support of this assertion, DuBois provides information about the size and names of different "security threat groups" (gangs and inmate organizations) in the Massachusetts prison system. At that time, "[t]he ever increasing danger of the situation is reflected in the fact that, during 1994 alone, 463 correctional officers were assaulted by inmates." DuBois also described the serious injuries that inmates inflicted on three guards, which led to the lockdown in 1995.

the assistant deputy commissioner,[14] all of which were "made on personal knowledge, . . . set forth such facts as would be admissible in evidence, and . . . show affirmatively that the affiant is competent to testify to the matters stated therein." Mass. R. Civ. P. 56 (e). The affidavits describe the changing racial composition of the prisoner population, the sharp increase in individuals labeled as gang members, and the accompanying increase in violence in the prison system. These affidavits provide a factual explanation for the changes in the configuration of Cedar Junction that is entirely unrelated to avoiding compliance with the DSU regulations.

The plaintiffs do not dispute the facts set forth in these affidavits. At best, the plaintiffs suggest that there is a difference of opinion as to the appropriate response of prison officials to the problem of incarcerating young, violent gang members. However, opinions are not facts. And a difference of opinion is not the same as a dispute as to material facts.

In his affidavit, the plaintiffs' expert provides his opinion, based on his experience as a warden of a maximum security prison in Ohio, regarding the appropriate treatment of inmates who are believed to be involved in gang activity. His review of inmate files led him to conclude that the Massachusetts prison system has "overuse[d]" segregation and "overreact[ed]" to gang identifications. This opinion does not satisfy the plaintiffs' burden of demonstrating that there is no genuine issue of material fact for summary judgment and that they are entitled to

---

[14]Assistant Deputy Commissioner Ronald Duval attested in a 1998 affidavit that: "During my twenty-five (25) years at MCI-Cedar Junction I have personally observed dozens of changes in the operational parameters of the prison. Every change was for the sole purpose of effectively managing the prisoner population in the Commonwealth's only maximum security prison. The extent to which the operational parameters of the [maximum] and [minium] wings have continually been adjusted, altered, and changed throughout the past 25 years, and more frequently in the past 10 years, is a direct result of corrections officials having to manage an increasingly violent prisoner population throughout the Department with limited resources." He noted that the changes to the maximum and minium wings "would drastically reduce violent acts among the prisoners."

judgment as a matter of law.[15] Indeed, if this claim had gone to trial, as I believe it should have, the jury would have had the opportunity to assess the soundness and credibility of the plaintiffs' expert's opinion. See *Leibovich* v. *Antonellis*, 410 Mass. 568, 573 (1991). The expert's testimony would not necessarily have been dispositive on this issue, and the jury would have been entitled to believe or disbelieve all, some, or part of the expert's testimony. See *Banaghan* v. *Dewey*, 340 Mass. 73, 79 (1959); *Dodge* v. *Sawyer*, 288 Mass. 402, 408 (1934). In the face of conflicting affidavits, the plaintiffs' expert's affidavit does not provide a basis on which the judge properly could have concluded that the reorganization of the maximum wing of the prison and its denomination as the "general population" of Cedar Junction was a pretext to avoid compliance with the DSU regulations.[16]

The court's opinion dismisses the content of the commissioner's submissions that present the department's reasons for the reorganization of Cedar Junction as "conclusory."[17] *Ante* at 754. I disagree on both points. The affidavits are not "conclusory," but rather describe the facts and circumstances that led to the creation of the current configuration of the Cedar Junction population. It is not "conclusory" to state that in 1994, there were 463 correction officers assaulted by inmates in the Massachusetts prison system, or that between February, 1992, and

---

[15]In its opinion, the court suggests that the defendants should have provided additional evidence to support their assertions about the increase in gang members and violence in Massachusetts prisons. *Ante* at 758-759. However, the commissioner does not bear the burden of proof as to the plaintiffs' motion for summary judgment; that burden is borne by the plaintiffs alone. The commissioner is not required to set forth his entire defense to the plaintiffs' claims to defeat a motion for summary judgment. The affidavits that the commissioner provided were sufficient to create a dispute concerning a material fact, which is all that is required to defeat such a motion.

[16]The court also focuses on the conclusion in the expert's affidavit that less than fifteen per cent of a random sample of 110 prisoners in the maximum wing had received a follow-up classification review within twelve months of their previous classification review. This reference is not relevant to the claim regarding the applicability of the DSU regulations to the maximum wing because classification hearings are governed by an entire separate regulatory scheme. See 103 Code Mass. Regs. §§ 420.00.

[17]The court does not challenge the credibility of the affiants. Of course, credibility is not an issue to be resolved on summary judgment. See *Attorney Gen.* v. *Brown*, 400 Mass. 826, 832 (1987).

February, 1995, the number of inmates in the Massachusetts prison system increased nearly ten per cent, from 9,970 to 10,835, while the number of correction officers decreased 3.5%, from 3,366 to 3,249. It is not "conclusory" to state that in 1995, 99% of the inmates at Cedar Junction were placed there because they had been violent and disruptive in other facilities. It is not "conclusory" to state that the ratio of inmates to correction officers at Cedar Junction in 1995 was greater than seven inmates to each correction officer at any given time. It is not "conclusory" to state that between March 1, 1995, and November 29, 1995, there were fifty incidents at Cedar Junction that required correction officers to use force against inmates. It is not "conclusory" to describe a July, 1993, confrontation between groups of prisoners at Cedar Junction that resulted in two prisoners being sent to a hospital in critical condition. And it is not "conclusory" to describe the attempted murder of a Cedar Junction correction officer in April, 1995, by a group of inmates, believed to be gang affiliated, who beat and repeatedly stabbed the officer, and the riot that ensued.

These were the facts that the commissioner presented to the judge to demonstrate that there is a disputed issue of material fact about the "real" reason the commissioner created the current configuration of Cedar Junction: whether the maximum and minimum wings were created in response to the increasingly violent and gang-oriented prison population, or whether they were created for the purpose of bypassing the due process requirements in the DSU regulations. Although the court's opinion relies solely on the conditions of confinement as the basis for its conclusion that the DSU regulations are applicable to prisoners transferred to or placed in the maximum wing, *Longval* v. *Commissioner of Correction*, 404 Mass. 325, 328 (1989), requires more, as do the "pragmatic and flexible" requirements of procedural due process. *Roe* v. *Attorney Gen.*, 434 Mass. 418, 427 (2001). On the record before him, the judge could not have found that there was no genuine dispute regarding this material fact. Summary judgment was therefore not appropriate.

4. *Conclusion.* The DSU regulations plainly do not apply to changes in the general conditions of confinement at any prison

in the Commonwealth, or to the mere presence of severely restrictive conditions. They have no relevance to decisions about where (i.e., in which general population area) a prisoner will be housed, or to decisions to increase security requirements within different levels of confinement. They were promulgated to afford due process rights for those prisoners singled out for isolation from the general population in conditions significantly more restrictive than those experienced by that general population. The record does not support a finding on summary judgment that this is occurring at Cedar Junction. The DSU regulations apply to the current operation of Cedar Junction, if at all, only if prisoners were selected for further segregation from the maximum wing or the minimum wing populations, under conditions significantly more restrictive than those present in either.

For these reasons, I dissent.